Clara Swinton BONDS, as Administratrix of the Estate of Franklin Hassie Bonds, Appellee,

v.

MORTENSEN AND LANGE; and the M/V "FETISH" and Rederiet Mascot K/S, Appellants.

No. 82–1067.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 10, 1983.

Decided Sept. 1, 1983.

Francis X. Byrn, New York City (John M. Toriello, Haight, Gardner, Poor & Havens, New York City, D.A. Brockinton, Jr., Brockinton, Brockinton & Smith, Charleston, S.C., on brief), for appellant.

Charles T. Smith, Georgetown, S.C. (James B. Moore, Jr., William W. Doar, Jr., Moore, Flowers & Smith, Georgetown, S.C., on brief), for appellee.

Before RUSSELL and ERVIN, Circuit Judges, and FIELD, Senior Circuit Judge.

FIELD, Senior Circuit Judge:

Franklin H. Bonds, a longshoreman formerly in the employ of the Ryan-Walsh Stevedoring Company (Ryan-Walsh), was crushed in an accident aboard the M/V FETISH, a vessel owned by defendant Rederiet Mascot K/S (the shipowner), and died of his injuries a week later. Pursuant to §§ 905(b) and 933 of the Longshoremen's and Harbor Workers' Compensation Act (LHWCA or Act), 33 U.S.C. §§ 901–950 (1976), the administratrix of Bonds's estate subsequently brought this action for wrongful death against the shipowner in the United States District Court for the District of South Carolina. In a bench trial, the district court found both the decedent and Ryan-Walsh to be without fault, and adjudged the shipowner to be liable to Bonds's estate under the Act in the amount of $395,522.20. Concluding that the shipowner is not liable under the LHWCA on the facts of this case, we reverse.

I.

The accident at issue occurred while Ryan-Walsh was discharging cargo from the FETISH in the port of Georgetown, South Carolina, during the week of March 26, 1979. The ship's equipment involved in the accident is a four-legged electrohydraul-ic gantry crane which straddles the cargo hold. The operator of the crane sits in a cab atop the gantry, and by means of manual devices can cause the entire gantry to roll forward and backward over the cargo hold, as needed. A bell located on the operator's cab normally rings when the gantry moves forward or backward to warn longshoremen and the ship's crew of the gantry's motion.

On Thursday, March 29, the fourth day of discharge operations, Bonds and one Hilton, the flagman, were reviewing unloading operations while standing on a steel bar running along the hatch and peering over the hatch combing into the hold. Gang foreman Blair was standing behind these two men on the leg of the gantry crane. The crane began to roll towards Bonds and Hilton, and Blair, sensing the motion of the crane, shouted to the men to get out of the way. Hilton safely jumped from the steel bar out of the way of the gantry crane, but Bonds was caught between the leg of the crane and one of the pedestals protruding from the ship's hatch before Blair managed to push the emergency cut-off button on the gantry leg. Bonds was pinned for several minutes in this position before the gantry could be reactivated and rolled back off of him. Bonds died one week later as a result of the injuries he received in the accident.

On the basis of the evidence before it, the district court commendably made detailed findings of fact concerning the events leading up to and including the accident. Among the more significant findings of the district court were the following: that Ryan-Walsh had worked the FETISH and its sister ships on numerous occasions; that an officer of the ship's crew observed and oversaw operations at all times; that from Monday through Wednesday no complaints were made about the ship's equipment by the longshoremen or Ryan-Walsh; that the gantry bell either was not working or was inaudible at the time of the accident; that the crane was so designed that the operator could not see anything in the vicinity of the crane legs; that the failure of the shipown-

er to post written instructions as to how to restart the gantry after the emergency cut-off has been tripped prevented the immediate release of Bonds and contributed to his injuries; and that "the defective warning bell, improper design, and lack of written operating instructions existed prior to the commencement of stevedoring operations." The district court further found that Bonds and Ryan-Walsh conducted themselves in a prudent and reasonable manner up to and through the time of the accident. On the basis of these and other findings, the district court concluded that the shipowner was liable for the accident under the Act.

The shipowner has appealed to this Court, alleging numerous errors in the district court's findings of fact, application of law, and calculation of damages. Because of our disposition of the case, we need only address the shipowner's first two contentions.

## II.

■ At the outset the shipowner challenges thirteen of the district court's twenty-eight findings of fact. The shipowner contends that several findings dealing with what the district court termed "responsibility and fault" are mixed questions of law and fact which are not entitled to protection under the clearly erroneous standard of Fed.R.Civ.P. 52(a), but rather subject to full review under *Hicks v. United States*, 368 F.2d 626, 631 (4 Cir.1966).

We do not agree that these findings are subject to full review by us. More recent decisions in our Circuit indicate that the ruling in *Hicks* on this point has to a large degree been abandoned, *see Famous Knit-*

*ware Corp. v. Drug Fair, Inc.*, 493 F.2d 251, 253 n. 2 (4 Cir.1974), and indicate that a district court's findings of negligence are generally treated as findings of fact reviewable under Fed.R.Civ.P. 52(a). *Scheel v. Conboy*, 551 F.2d 41, 43 (4 Cir.1977); *Lane v. United States*, 529 F.2d 175, 180 (4 Cir.1975); *Kloster v. Steamship Chatham C.A.*, 475 F.2d 43, 44 (4 Cir.1973); *Tucker v. Calmar Steamship Corp.*, 457 F.2d 440, 444 (4 Cir.1972). We see no reason to depart from this general rule in the present case, and therefore reject the shipowner's contention that we should subject the district court's findings of fact to full review.

The shipowner further contends that applying the clearly erroneous standard of review of Fed.R.Civ.P. 52(a), many of the district court's findings of fact must be overturned as plainly erroneous. A careful review of the record leads us to the conclusion that none of the district court's factual determinations is clearly erroneous.[1] Most of the challenged findings are based on conflicting oral testimony, and we are reluctant to disturb these findings in light of the district court's opportunity to assess the demeanor and judge the credibility of the witnesses. *Sperry Rand Corporation v. A–T–O, Inc.*, 447 F.2d 1387, 1390–91 (4 Cir.), *cert. denied*, 405 U.S. 1017, 92 S.Ct. 1292, 31 L.Ed.2d 479, *cert. denied*, 409 U.S. 892, 93 S.Ct. 117, 119, 34 L.Ed.2d 150 (1971); *Hicks, supra*, 368 F.2d at 630; C. Wright & A. Miller, Federal Practice and Procedure § 2586, at 737 (1971). A review of the evidence as a whole does not lead us to a firm and definite conviction that a mistake has been committed relative to any of the court's findings. *United States v. U.S.*

---

**1.** The district court's final three findings of fact deserve special mention. These findings are:

26. I find that the manner in which the decedent, Bonds, conducted himself as a longshoreman was prudent and reasonable under the circumstances and that his actions were in no way a contributing proximate cause of the accident.

27. I find that the manner in which Ryan-Walsh Stevedoring Company conducted itself as stevedores was prudent and reasonable under the circumstances and that its actions were in no way a contributing proximate cause of the accident.

28. In determing [sic] the fault among the parties, I find that the defendants were solely at fault.

As we have noted, we adopt findings 26 and 27 that neither Bonds nor Ryan-Walsh was negligent since these findings are not clearly erroneous. Finding 28 does not assign negligence to the shipowner, and we take this finding to mean that the shipowner was responsible for the conditions aboard ship which contributed to the accident. The significance of this finding under *Scindia Steam Nav. Co. v. De Los Santos*, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981), is discussed *infra*.

*Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948). We therefore accept the district court's findings of fact for purposes of review.

### III.

The shipowner's central contention on appeal is that even under the facts as found by the court the shipowner should not be held liable under § 905(b) of the LHWCA. We agree.

■ Under § 905(b)[2] of the Act, a shipowner is liable for an injury to a covered person only where the injury is caused by the ship's negligence. Unseaworthiness, an historic ground for recovery under the Act, was abolished as a basis for shipowner liability by the 1972 Amendments to the LHWCA. H.R.Rep. No. 1441, 92d Cong., 2d Sess., *reprinted in* [1972] U.S.Code Cong. & Ad.News 4698, 4701–05; *Scindia Steam Nav. Co. v. De Los Santos,* 451 U.S. 156, 164 & n. 13, 101 S.Ct. 1614, 1620 & n. 13, 68 L.Ed.2d 1 (1981). As explained by the Supreme Court in *Scindia,* 451 U.S. at 165, 101 S.Ct. at 1621, and noted more recently by us in *Gill v. Hango Ship-Owners/AB,* 682 F.2d 1070, 1073 (4 Cir.1982), the difficult question which remains under the Act is when a shipowner's conduct can be characterized as negligent, and that is the issue which we face in the present case.

Looking first to the legislative history of the 1972 Amendments, the Supreme Court aptly noted in *Scindia* that little guidance may be found in the Committee Reports.

*Scindia,* 451 U.S. at 165 & n. 13, 101 S.Ct. at 1620 & n. 13. The House Report states that under the Amendments shipowner liability based on unseaworthiness is abolished and that a vessel will be held liable only for its own negligence; whether a vessel should be found negligent in a particular situation can be resolved only through the ordinary process of litigation. H.R.Rep. No. 1441, 92d Cong., 2d Sess., *reprinted in* [1972] U.S.Code Cong. & Ad.News 4698, 4703–04; *Scindia,* 451 U.S. at 165 n. 13, 169 n. 16, 101 S.Ct. at 1620 n. 13, 1623 n. 16. The question of what the exercise of reasonable care under the circumstances would require was thus specifically left open under the 1972 Amendments. *Scindia,* 451 U.S. at 169 n. 16, 101 S.Ct. at 1623 n. 16.

Turning next to the decision in *Scindia,* we note that the Court there did not expressly adopt or reject the competing views of the circuits as to the appropriate standard to be applied in determining negligence under the Act. *E.g., Gill, supra,* 682 F.2d at 1073. *Scindia* does, however, provide considerable guidance in analyzing the question of shipowner negligence under the Act. First, the Court made it clear that the shipowner may rely on the stevedore in the first instance to avoid exposing the longshoremen to unreasonable hazards.[3] *Scindia,* 451 U.S. at 170, 101 S.Ct. at 1623. In addition to clarifying that the primary responsibility for the safety of the longshoremen lies with the stevedore, the Court noted that two of the principal duties of the shipowner under the LHWCA are to turn

**2.** 33 U.S.C. § 905(b) provides in relevant part:
　　In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void.... The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred....

**3.** Pointing to the Supreme Court's admonition in *Scindia* that positive law is relevant in deter-

mining the legal duties placed upon the stevedore, 451 U.S. at 176, 101 S.Ct. at 1626, the shipowner argues on appeal that the district court erred in excluding evidence of several regulations promulgated by the Occupational Health and Safety Administration (OSHA) and allegedly violated by the stevedore. The regulations cited to us by the shipowner are 29 C.F.R. §§ 1918.51(b), .53(a)(5), .81(g), and .97(a) (1982). Our review of these regulations leaves us satisfied that in the present case none of the cited provisions alters the relative burdens placed on the stevedore and shipowner under *Scindia* to remedy unsafe conditions, and we therefore find that any error committed by the district court in excluding evidence of these OSHA provisions was harmless.

the ship over to the stevedore in such condition that "an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property," *id.* at 167, 101 S.Ct. at 1622, and to intervene and stop unloading operations when the stevedore's judgment in carrying out his tasks is "obviously improvident," *id.* at 175–76, 101 S.Ct. at 1626.

Our reading of the district court's opinion indicates that the court placed liability on the shipowner primarily because the court concluded that the malfunctioning bell and the ship's design, taken in tandem, constituted the proximate cause of the accident. Because the shipowner was responsible for the condition of the ship and its gear, the district court reasoned that the shipowner was liable for the injuries which resulted from these conditions. The relevant inquiry under *Scindia* in determining shipowner liability, however, is whether under the stated conditions the ship was unreasonably unsafe for unloading or whether the stevedore's judgment to proceed with the unloading was "obviously improvident." *Scindia,* 451 U.S. at 167, 175, 101 S.Ct. at 1622, 1626.

The Court in *Scindia* directly addressed the question of shipowner negligence in the face of malfunctioning equipment in a situation quite analogous to the present case. In enunciating the standard of shipowner negligence to be applied under the LHWCA, the Court stated:

On the facts posited here, for two days prior to the accident, it had been apparent to those working with the winch that this equipment was malfunctioning.

*Even so, whether it could be safely used or whether it posed an unreasonable risk of harm to [the longshoreman] or other longshoremen was a matter of judgment committed to the stevedore in the first instance.* The malfunctioning being obvious and [the stevedore] having continued to use it, [the shipowner] submits that if it was aware of the condition or was charged with knowledge of it, it was nevertheless entitled to assume that [the stevedore], the specialist in loading and unloading, considered the equipment reasonably safe and was entitled to rely on that judgment.

Yet, it is quite possible, it seems to us, that [the stevedore's] judgment in this respect was so obviously improvident that [the shipowner], if it knew of the defect and that [the stevedore] was continuing to use it, should have realized the winch presented an unreasonable risk of harm to the longshoremen, and that in such circumstances it had a duty to intervene and repair the ship's winch. *The same would be true if the defect existed from the outset and [the shipowner] must be deemed to have been aware of its condition.*

451 U.S. at 175–76, 101 S.Ct. at 1626 (footnote omitted, emphasis supplied).

■ In the present case, we adopt the finding of the district court that the bell was malfunctioning from the commencement of stevedoring operations for some three days prior to the accident. However, the malfunctioning bell and ship's design being obvious and known to all,[4] the shipowner was entitled to rely on Ryan-Walsh's judgment as to whether discharge opera-

---

4. Ample testimony in the record reveals that the longshoremen, Ryan-Walsh, and the officer of the ship's crew present during unloading of the vessel's cargo were aware that the bell was not functioning properly. Apparently, no one who had knowledge of this defect believed that the problem posed any serious threat of harm; indeed, the district court specifically found that there were no complaints about the ship's equipment through the time of the accident.

A further note in this regard is in order. In holding the shipowner liable, the district court gave some weight to the fact that an officer of

the ship's crew observed discharge operations and had the authority to halt operations in the event an unsafe condition developed. We do not take the presence of the officer to mean that the shipowner had undertaken any duties beyond those specified in *Scindia.* Certainly, we do not take the presence of an officer of the ship's crew to constitute "active involvement" in discharge operations within the meaning of *Scindia,* 451 U.S. at 167, 101 S.Ct. at 1622, and conclude that the district court erred to the extent that its conclusions were based upon any sort of "active involvement" theory.

tions could safely be undertaken. Ryan-Walsh obviously concluded that these conditions did not pose an unreasonable risk of harm, for the longshoremen proceeded to unload the ship's cargo without complaint or incident until the time of the accident.

Under *Scindia,* the shipowner was entitled to rely on Ryan-Walsh's judgment to unload cargo while the gantry bell was malfunctioning unless Ryan-Walsh's judgment in proceeding under the circumstances was "obviously improvident." 451 U.S. at 175, 101 S.Ct. at 1626. However, the district court specifically found that both Ryan-Walsh and Bonds acted prudently and reasonably [5] in proceeding to unload cargo under the stated conditions. Having so found, it would be antithetical for the court to conclude under *Scindia* that the conduct of Ryan-Walsh and Bonds was "obviously improvident"; and accordingly, the district court erred in its conclusion that the shipowner had a duty to intervene and stop the discharging operations based upon either the malfunctioning bell or the ship's design.

Accordingly, the judgment of the district court is reversed.

REVERSED.

---

**5.** Even assuming, contrary to the district court's finding of fact, that Bonds and other longshoremen failed to exercise reasonable care by standing near the gantry crane legs during discharge operations, this is not a case in which the shipowner should have anticipated that the stevedore could not avoid the dangerous condition. *See Gill, supra,* 682 F.2d at 1074–75. Granted that Bonds and Ryan-Walsh were not in a position to fix the gantry bell or alter the ship's design, testimony at trial established that there were several safe locations from which the uninjured flagman could carry out his tasks and from which Bonds, who was off-duty at the time of the accident, could re-

view operations while receiving instructions as to how work would proceed when he returned to the crane. This is not a situation, then, in which the longshoremen were precluded from performing their tasks except by a means which was inherently dangerous. *See Napoli v. Hellenic Lines, Ltd.,* 536 F.2d 505, 509 (2 Cir.1976).

In our opinion the exculpative findings of the district judge together with the fact that the conditions in the present case were not of such a nature that the work of the stevedore could not be carried on with reasonable safety distinguish this case from *Woodruff v. United States,* (4 Cir.1983), 710 F.2d 128.