Gary T. **HODGES** and Liberty Mutual Insurance Company, Appellees,

v.

**EVISEA MARITIME CO., S.A., Appellant,**

and

**Concordia Line, Defendant.**

No. 85–1107.

United States Court of Appeals, Fourth Circuit.

Argued June 5, 1986.

Decided Sept. 22, 1986.

Rehearing and Rehearing En Banc Denied Oct. 29, 1986.

John H. West, III, and David B. Hamilton (Ober, Kaler, Grimes & Shriver, Baltimore, Md., on brief), for appellant.

David Skeen (Stephen F. White, Wright, Parks, Constable & Skeen, Baltimore, Md., on brief), for appellees.

Before RUSSELL and PHILLIPS, Circuit Judges, and BUTZNER, Senior Circuit Judge.

JAMES DICKSON PHILLIPS, Circuit Judge:

Evisea Maritime Co., S.A. (Evisea) appeals from a judgment entered upon a verdict awarding damages to Gary Hodges and the Liberty Mutual Insurance Company (Liberty Mutual). Evisea contends that under § 5(b) of the Longshore and Harbor Workers' Compensation Act (LHWCA), it could not properly be found liable for injuries suffered by Hodges upon a vessel owned by Evisea. Evisea therefore argues that the district court erred in refusing either to direct a verdict or to grant judgment notwithstanding the verdict in its favor. Alternatively, Evisea argues that the district court misinstructed the jury, and therefore erred in denying Evisea's motion for a new trial. Although we find that the evidence adduced at trial sufficed to support the jury's verdict, we agree that the jury did not receive proper instruction on the duties imposed by the LHWCA upon shipowners and stevedores, and therefore reverse the judgment and remand for a new trial.

## I

On July 26, 1977, the M/V Concordia Sky was engaged in cargo operations in Newport News, Virginia, when an unidentified and semi-conscious man was discovered in the No. 3 lower tween deck. The man was wearing a T-shirt or sweatshirt, sweatpants, and tennis shoes. He was unable to communicate, and was initially mistaken for a stowaway, but was eventually taken to a hospital. Several days later, he was identified as Gary Hodges, a longshoreman who had worked on the Concordia Sky during its loading in Baltimore on July 25. Evisea is the owner of the Concordia Sky.

An investigation of the circumstances leading to Hodges' presence in the No. 3 lower tween deck was thereafter conducted by Liberty Mutual, the compensation carrier for the stevedore employing Hodges, Robert C. Herd & Co. (Herd, the stevedore). Although Hodges' co-workers and supervisors were interviewed, no eyewitnesses to Hodges' injury were found. Hodges himself suffered serious head injuries, and claimed a retrograde memory loss leading to an inability to recall anything immediately prior to or regarding his apparent accident. Because Liberty Mutual could not satisfy its statutory burden to show that Hodges' injury was not work related, Hodges was awarded disability benefits paid by Liberty Mutual pursuant to the LHWCA.

Hodges subsequently sued Evisea and the charterer of the Concordia Sky, Concordia Line, alleging that the ship's negligence caused his injuries. Liberty Mutual intervened as a plaintiff to recover its interest pursuant to 33 U.S.C. § 933 (1982). Hodges' theory of negligence turned primarily on his assertion that prior to his injuries he was working in the ship's No. 2 hold, that he returned to the previously loaded No. 3 hold to obtain additional dunnage, and fell through an open hatch on the No. 3 upper tween deck. Hodges asserted that the vessel was negligent both in leaving the hatch open and in failing to provide adequate

lighting or other safety measures that would have prevented the fall.

The district court entered summary judgment in favor of the defendants, but during the pendency of Hodges' appeal from that ruling, the Supreme Court decided *Scindia Steam Navigation Co. v. De Los Santos,* 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981), which clarified the relative duties of shipowners and stevedores within the context of § 5(b) of the LHWCA. Because the district court had not had the opportunity to consider the decision in *Scindia* when it ruled on the summary judgment motion, this court vacated the summary judgment order insofar as it related to Hodges' claims of negligence, and remanded the case for further proceedings. In our unpublished opinion, we observed that "[f]or the purposes of the summary judgment motion," Hodges was entitled to a permissible inference from the forecast evidence of the facts supporting his theory of negligence.

After remand, following a period of discovery, the case proceeded to a jury trial. At the trial, there was no substantial dispute that Hodges had suffered severe injuries, including a fractured skull, retrograde amnesia, and a psychiatric disability. The liability of defendants depended, however, upon a showing by Hodges of sufficient evidence to support his theory that he left the No. 2 hold to obtain dunnage, and that his fall through the No. 3 upper tween deck hatch was attributable to a negligent act or omission of the vessel.

Evisea and Concordia Line defended on the theories that the evidence would show that they did not have a duty to Hodges, that Hodges' theory of the injury was merely speculative, and that the evidence supported their theory that Hodges was in the upper tween deck for a nap, and was not in the performance of his longshoreman duties when he was injured.

Hodges' first witness was Christiansen, Evisea's marine surveyor. Christiansen testified that the No. 2 and No. 3 holds were connected at the upper tween deck level, that the lights in No. 3 may or may not have been operative, that the hatch in No. 3 was open during the Baltimore loading operations, and that the hatch was four feet from the entrance from No. 2 to No. 3 and large enough for a man Hodges' size to fall through.

Gross, a longshoreman and friend of Hodges, was working with him on the day of the accident. He testified that Hodges had been dressed in sweats and a T-shirt before he disappeared, that Hodges' job was to obtain dunnage when needed, that dunnage had often been needed that day, that there was extra dunnage in No. 3 after they finished work there, and that a need for more dunnage in No. 2 had been expressed before Hodges disappeared. Gross testified that he originally thought that Hodges had left to get dunnage, but that he later assumed that Hodges, who rode a bicycle ten miles to work each day, must have left to go home because it was raining. Gross also testified that when the weather deck hatch covers were closed, there was very little light in the holds, and that the cluster lights brought in to light the No. 2 hold would not have illuminated No. 3. He said that he thought it was the usual practice, once a hold had been loaded, to close all the decks to avoid the danger of a fall, so that he would not have expected the hatch on the No. 3 upper tween deck to be open.

Gill, another longshoreman, testified that when he last saw Hodges he was looking for dunnage, that when more dunnage was needed they would often go to other holds and decks to find it, and that No. 3 was poorly lit. He substantiated the theory that at the time Hodges was hurt, he might have been looking for dunnage. He testified that the gang had looked for Hodges before they left, but may not have seen him in No. 3 because it was dark.

Two doctors also testified for Hodges. Dr. McAdam stated that Hodges' head injury was consistent with either a fall or being struck with a blunt instrument (which was one of defendants' theories). Dr. McAdam also stated that the injuries were consistent with Hodges' claim of amnesia. Dr. Oror

testified that the likely cause of the injury was a fall, and that Hodges could not have been hit with a blunt instrument because there was no evidence of a depression at the injury site.

There was further testimony that when Hodges was found at Newport News, there were blood stains on the No. 3 ladder and on the area of the deck where Hodges was found. Longshoremen from Newport News also testified that the lighting in No. 3 was inadequate, and that they had to obtain cluster lights before they removed Hodges from the hold on the afternoon of July 26.

Other testimony disclosed that for safety reasons it was customary to close hatches once a hold had been loaded, that the opening and closing of hatch covers was the job of the vessel's crew, and that the hatch covers in No. 3 were left open for the convenience of the vessel (because it would avoid having to reopen them the next day in Newport News). Defendants had indicated during discovery that the lights in the No. 3 hold were not on at the time Hodges suffered his injuries.

At the close of Hodges' evidence, both defendants moved for a directed verdict. The district court granted the motion of Concordia Line, but denied that of Evisea, which proceeded as the sole defendant.

Two of Hodges' supervisors, Amos, the gang leader, and Der, the foreman, testified for Evisea. Der stated that the longshoremen were responsible for obtaining dunnage, and that they often went to other levels of the ship to obtain it. He testified that it was the responsibility of the vessel to close hatches and turn lights on and off. He observed that the ship's crew had closed the No. 3 weather deck hatch on July 25, and that the stevedore usually placed ropes or nets around an open hatch as a safety measure, but that at the time of Hodges injury the No. 3 hold was no longer a work area. Der and Amos both testified that they knew of the open hold, but Der also apparently thought that the hatch presented no danger because he thought the lights were on in No. 3. Amos and Der also expressed their belief that there was not a need for more dunnage in No. 2, and that the work was completed without additional dunnage.

Amos testified, as had Gill earlier, that when last seen on July 25, Hodges was wearing a dark shirt, shorts, gloves, safety shoes, and a hardhat. These clothes were never located, and as already mentioned, Christiansen had described Hodges as being in the different clothes in which he was found. Evisea's theory was that Hodges had changed clothes in preparation for his bike ride home. Amos testified that he thought Hodges had left to take a nap, and Gross and Gill had testified that Hodges wore gloves when handling dunnage.

Amos also stated that the vessel's crew had responsibility for control of the lights. Additional evidence indicated that the ship's crew was not present in the stevedoring work area, and that no safety complaints were received from the longshoremen. Representatives of the vessel had testified that because work in the No. 3 hold was complete, they had no expectation that the longshoremen would return there.

At the conclusion of the presentation of its evidence, Evisea renewed its motion for a directed verdict, which the district court denied. The district court also rejected several proposed instructions proffered by Evisea. The jury decided in favor of the plaintiffs, and, in answer to written interrogatories, found (1) that Evisea was negligent; (2) that Hodges was twenty percent contributorily negligent; and (3) that the total damages sustained amounted to $1 million. Reduced by the degree of Hodges' contributory negligence, this verdict resulted in the entry of judgment against Evisea in the amount of $800,000. Evisea thereafter filed motions for judgment n.o.v. and for a new trial. Those motions were denied, and following the entry of judgment in favor of Hodges and Liberty Mutual, Evisea took this appeal.

## II

Evisea first argues that the district court erred in refusing to grant its motions for

directed verdict and for judgment n.o.v. Evisea asserts that it was entitled to judgment because the evidence at trial showed neither that it owed a duty to Hodges nor that Hodges' injuries were the result of a breach of duty by Evisea. Evisea properly observes that the jury verdict in favor of the plaintiffs in this case must be based on inferences within the range of substantial or reasonable probability, *see Lovelace v. Sherwin-Williams Co.,* 681 F.2d 230, 242 (4th Cir.1982). We disagree with Evisea's contention that the evidence in this case did not permit such inferences, however, and we conclude that it was not error for the district court to deny Evisea's motions for directed verdict and judgment n.o.v. The jury could, on the evidence before it, find both the existence of a duty and Evisea's breach of it, so that the verdict was within the range of permissible inference.

■ The 1972 amendments to the LHWCA eliminated the right of longshoremen to recover from a shipowner for acts caused by unseaworthiness, and limited the right to recover to those injuries caused by the shipowner's negligence. Congress left the determination of the applicable standard of negligence to the courts. In *Scindia Steam Navigation Co. v. De Los Santos,* 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981), the Supreme Court wrote to clarify the relative duties of shipowners and stevedores under the LHWCA. Rejecting the land-based negligence standards applied by some courts, the Supreme Court concluded that § 5(b), of the LHWCA does not impose upon the shipowner a continuing duty to inspect the cargo operations once the stevedore has begun work. Rather, prior to the commencement of stevedoring operations, the shipowner must *"at least"* exercise ordinary care under the circumstances to have the ship in such a condition that an experienced stevedore, with the exercise of reasonable care, can carry out its operations. The shipowner must warn the stevedore of hazards that are or should be known to the vessel, if the hazards are not known or should be known to the stevedore. The vessel is also liable, after the stevedoring work has begun, if it

actively involves itself in the cargo operations and its negligence causes an injury, or if it fails to exercise due care to intervene to protect longshoremen from hazards under the active control of the vessel during the stevedoring operation. 451 U.S. at 166–68.

Thus, Evisea's liability in this case must arise from its turning over of the vessel to the stevedore in a dangerous condition, from its negligence while actively involved in the stevedoring operation, or from its failure to exercise due care with regard to hazards in an area under its control. Evisea contends that it was entitled to a directed verdict or to judgment n.o.v. under these principles from *Scindia* because there was not sufficient evidence to support a finding of its liability under any of these theories. We disagree with this assessment of the evidence.

■ Although there was no evidence upon which the jury could find that Evisea had turned the ship over to Herd in a dangerous condition, there did exist evidence from which the jury could conclude that the vessel had a duty to intervene and exercise its control over the No. 3 hold to eliminate the dangerous conditions of the open hatch and poor lighting. That the hatch was open and the hold unlit is not in dispute, and there was sufficient evidence of control by Evisea to create a jury issue. Although the holds had been turned over to the stevedore, the ship's crew knew that loading in the No. 3 hold was complete, and had closed the weather deck hatch. There was testimony that it was the duty of the vessel to see to the closing of the hatches, and further testimony that the hatch in No. 3 was left open for the convenience of the ship. The stevedore disclaimed knowledge of how to control the lights in No. 3, and there was evidence that the crew had earlier turned the lights off. This testimony, considered in the light most favorable to Hodges, created a permissible inference that the vessel was in sufficient control of the No. 3 hold to give rise to a duty under *Scindia.*

■ Having concluded that the jury could find a duty of intervention under *Scindia,* we must repair to more general concepts of negligence to determine if there was sufficient evidence of a breach of the duty. Evisea also argues that, as a matter of law, it did not breach any duty owed to Hodges because it could not foresee that he would reenter the No. 3 hold, because the danger was apparent and hence there was no obligation to warn, and because the negligence of Hodges and/or the stevedore should be viewed as the sole proximate cause of Hodges' injuries.

Because the stevedore had reported to the crew that the loading was complete in the No. 3 hold, the vessel may have assumed that the longshoremen were finished there, and that they would not reenter the compartment. The lights were turned off, and the upper tween deck hatch left open. From this evidence, Evisea argues that a fall by Hodges was not foreseeable. This question was properly for the jury, however. The two holds were connected, so it could be seen as not unusual that a longshoreman would enter a hold where loading was complete to obtain dunnage for use in the connected hold. Moreover, there was at trial at least a dispute as to whether the vessel had been actually informed that no further work would be done in the No. 3 hold.

Evisea also asserts that the jury should not have been permitted to find negligence because the apparent danger of the dark hold eliminated any duty of Evisea to warn of the danger. But we agree with the reasoning in two cases decided prior to *Scindia* which upheld findings of shipowner liability on similar open-hatch facts, *see Johnson v. A/S Ivarens Rederi,* 613 F.2d 334 (1st Cir.1980); *Badalamenti v. United States,* 160 F.2d 422 (2d Cir.1947), and if the jury could properly find that Evisea had control over the relevant area, this question was also properly for the jury. It was arguably foreseeable to the shipowner that a longshoreman would enter the darkened No. 3 hold and fall through the hatch, and the longshoreman's negligence in entering the darkened hold

might not wholly or even partially insulate the independently negligent act of leaving the hatch open. *United States Fidelity & Guaranty Co. v. Jadranska Slobodna Plovidba,* 683 F.2d 1022 (7th Cir.1982), is not to the contrary. In that case, the court held that under similar facts a jury could find a shipowner not negligent. The court did not hold, however, that the evidence in that case would not have supported any contrary verdict, or that the question was not for the jury at all.

■ Finally, Evisea argues that because there was no evidence that directly substantiated Hodges' theory of the accident, the verdict was based upon impermissible speculation. Hodges asserted that the injury occurred while he was in the No. 3 hold searching for dunnage. Although the evidence arguably supported other theories as well, there was evidence that justified Hodges' account of the injury. The trial testimony included evidence from Hodges' co-workers that dunnage was needed and that they thought Hodges had left to find dunnage. There was also testimony to the effect that the No. 3 hold was too dark for Hodges to see the open hatch, that the hatch was of sufficient size for Hodges to have fallen through it, that Hodges was found on the lower tween deck, and that blood stains were present on the ladder between the upper and lower tween decks. Upon this evidence, the jury could find Evisea liable by inferences within the range of reasonable probability, and the district court properly refused either to grant a directed verdict or judgment n.o.v.

III

■ We turn next to Evisea's contentions that the court erred in its instructions to the jury on the issue of the relative duties of stevedores and shipowners once stevedoring operations are underway.

After instructing the jury on general principles of negligence, the district court properly described the shipowner's duty to turn over to the stevedore a safe work place, the initial duty of care described in

*Scindia.*[1] The court refused, however, to give extensive instructions proffered by Evisea that were designed to describe the relative duties of the stevedore and vessel once the stevedoring operation has commenced.[2] The sole instruction given by the

**1.** The court instructed

The ship owner has a duty with respect to the condition of the ship's work space to be used in the stevedoring operation; and, if the ship owner fails to at least warn the stevedore of hidden dangers which would have been known to him in the exercise of ordinary and reasonable care, the ship owner has breached its duty and is liable if its negligence causes injury to the longshoreman.

A ship owner's duty to provide longshoremen with a reasonably safe place to work is confined to those areas of the vessel where longshoremen may be reasonably expected to go. If you find that the defendant could not reasonably hae [sic] foreseen that Mr. Hodges would enter the number three cargo area on the evening of July 25, 1977 or thereafter, you must find that the defendant had no duty with respect to Mr. Hodges in that area. If you find that Mr. Hodges was injured whie [sic] in the number three hatch, he has the burden to show that he was in the number three hatch for a legitimate purpose. If Mr. Hodges fails to meet this burden, you may weigh that fact when considering whether it was reasonably foreseeable for him to be in the number three cargo area on the evening of July 25, 1977.

An accident that is unprecedented or extraordinary is not necessarily unforeseeable. If you find that the defendant could not have reasonably foreesseen [sic] that Mr. Hodges would enter the number three hatch in the course of the longshoring cargo operation in the number two hatch, you must find taht [sic] the defendant had no duty with respect to Mr. Hodges and, therefore, was not negligent with respect to him.

The ship owner is not a guarantor or insurer of the safety of the premises of the vessel. On the contrary, the ship owner is entitled to assume that longshoremen who are working aboard their essel [sic] will see and observe that which wuld [sic] be obvious through reasonably to be expected use of an ordinary person's senses. So, there is no duty to give a longshoreman such as Mr. Hodges notice of an obvious danger or a danger that would be apparent to the reasonably prudent person exercising ordinary care under the circumstances, as shown by the evidence in this case, unless the ship owner should have anticipated the harm despite such knowledge or obviousness.

**2.** These tendered instructions often paraphrased or quoted from *Scindia:*

19. The shipowner is under a duty to exercise ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by their exercise of reasonable care to load and discharge the cargo with reasonable safety to persons and property and to warn the stevedore of any hazard which would likely be encountered by the stevedore but which is not known or obvious to the stevedore or reasonably to be anticipated by the stevedore if reasonably competent in the performance of its work....

20. The shipowner is under a duty to give warning to the stevedore of any hazards on the ship or with respect to ship's equipment that are known to the shipowner, or should be known to it in the exercise of reasonable care, that would likely be encountered by the stevedore in the course of the loading or discharging operation, but which are not known by the stevedore and would not be obvious to or anticipated by the stevedore if reasonably competent in the performance of its work. Therefore, if you find that there was a hazard on the vessel which caused Mr. Hodges injury and if you also find that the stevedore, Robert C. Herd & Co., knew or should have known of the hazard, then there was no duty on the part of the shipowner to give a warning of such hazard....

23. As a general matter, the shipowner may rely on the stevedore to avoid exposing the longshoremen such as the plaintiff to unreasonable hazards....

24. It is the stevedore's statutory duty, in the first instance, as the employer of the longshoremen, to provide a reasonably safe place to work and to take such safeguards with respect to equipment and working conditions as may be necessary to avoid injury to the longshoremen. The shipowner is not the employers [sic] of the longshoremen and were [sic] not the employers [sic] of Mr. Hodges and, therefore, did not owe such a statutory duty to him....

26. In the allocation of duties between the shipowner and the stevedoring company, it is the stevedoring company that is assumed to be expert and experienced in the work of loading and discharging cargo and to be aware of the risks and hazards which are normally to be found on a ship. The stevedore is expected and obligated to load and discharge cargo and perform all the functions relating to loading and discharging safely, properly and in a workmanlike manner in accordance with the skill and knowledge required of the stevedore. The shipowner has no duty to superintend or oversee the operations of the stevedoring company or its employees....

27. The primary responsibility for the safety of Mr. Hodges is that of his employer, the stevedore, Robert C. Herd & Co., Inc. If you find that Robert C. Herd & Co., Inc. reasonably fulfilled this responsibility to Mr. Hodges, then, likewise you should find that the shipowner was not responsible for any injuries to Mr. Hodges....

court that touched on the division of responsibility between the vessel and the stevedore during ongoing operations was this:

It is not contended by the plaintiffs that the ship owner had a duty to superintend or oversee the operations of the stevedoring company or its employees, and the ship owner in fact had so such duty under the facts of this case.

This is an unexceptional statement of the law and evidence so far as it goes, but we think it does not go far enough.

In *Scindia*, as indicated, the Supreme Court was primarily concerned to define the duties of care owed by shipowners to longshoremen under § 5(b) of the LHWCA, which had been amended by Congress in 1972 specifically to reallocate the responsibility for injuries to longshoremen. The 1972 amendments both eliminated the right of a longshoreman to recover from the vessel for injuries attributable to unseaworthiness, and ended the shipowner's right to recover from the stevedore in a third-party action. The longshoremen's cause of action that emerged was for the shipowners' negligence, and in *Scindia*, the Court was primarily concerned to define the circumstances under which the shipowner is under any duty of care running to the longshoremen. As discussed above, the shipowner is responsible to exercise due care to turn over to the stevedore a workplace that is free of hidden dangers, or to warn the stevedore of such dangers if they exist. The owner may also be liable if it becomes actively involved in the cargo operation and causes injury by its negligence, or if during the cargo operations it negligently fails to intervene to eliminate or warn of hazards in areas under the active control of the vessel. *Scindia*, 451 U.S. at 166–68, 101 S.Ct. at 1621–23; *Kakavas v. Flota Oceanica Brasileira, S.A.*, 789 F.2d 112, 118–19 (2d Cir.1986) (Friendly, J.);

see generally Note, *A Review of Shipowners' Statutory Duty Under § 905(b) of the Longshoremen's and Harborworkers' Compensation Act: Does Scindia Require a Change in Course?*, 1983 Duke L.J. 153 (1983) (parameters of shipowner's duty after *Scindia*); Note, *The New Negligence Standard for Shipowners and Longshoremen—Scindia Steam Navigation Co. v. De Los Santos*, 13 Loyola U.L.J. 83, 92–105 (1981) (scope of duties described in *Scindia*).

The "basic thrust" of *Scindia* is therefore that the "primary burden [is] on the stevedore for avoiding injuries caused by obvious hazards," see 451 U.S. at 180, 101 S.Ct. at 1628 (Powell, J., concurring), and each of the potential shipowner duties outlined in *Scindia* exists only as a supplement to the duty of the stevedore so to supervise its longshoremen that injuries will not result from obvious or warned-of defects of the vessel or its equipment. In the instant case, there was evidence supporting Evisea's theory that if the open hatch and unlit hold were dangerous conditions, they were conditions that arose during the stevedore's cargo operations and that were as much within the stevedore's actual or constructive knowledge as the shipowner's. Evisea was therefore entitled to proper instruction on the limitations of its duty to longshoremen in respect of these particular conditions during the cargo loading operations.

The district court did instruct the jury that Evisea had no duty to "superintend or oversee," but, as indicated, this brief instruction did not adequately reflect the limits of the owner's duties under § 905(b) as defined in *Scindia*. Before a shipowner can be said to have a duty to correct or warn of a condition arising during the cargo operation, the owner must be chargeable both with knowledge of the con-

---

28. The only duty that a shipowner has with respect to the operations of the stevedore is a duty to prevent harm that may result from an obviously improvident failure of the stevedore to take such proper precautions in the face of an obvious and unreasonable danger if the owner knows of the danger and of the stevedore's failure to prohibit its personnel from exposure to the danger. If the danger is known to the stevedore and the owner has no reason to believe that the stevedore will not take precautions to said danger, then the owner cannot be liable for any injury to the longshoreman occasioned as a result of said danger.... [Citations omitted.]

dition and with knowledge that despite the danger, the stevedore is continuing its operations. *See Scindia,* 451 U.S. at 175–76, 101 S.Ct. at 1626–27. If the shipowner may reasonably believe, despite its own knowledge of the danger, that the stevedore will act to avoid the dangerous conditions, the owner cannot be said to have been negligent, for the decision whether a condition imposes an unreasonable risk of harm to longshoremen is "a matter of judgment committed to the stevedore in the first instance." *Id.* at 175, 101 S.Ct. at 1626.

> [T]he legal duties placed on the stevedore and the vessel's justifiable expectations that these duties will be performed are relevant in determining whether the shipowner has breached its duty. The trial court, and where appropriate the jury, should thus be made aware of the scope of the stevedore's duty under the positive law.

*Id.* at 176, 101 S.Ct. at 1626.

In this case, the district court declined to give requested instructions that were directed specifically to the allocation of duties of care with respect to dangerous conditions between the vessel and stevedore during ongoing stevedoring operations. Although the requested instructions need not have been given in the exact form and great detail presented, they sufficed to alert the district court that the charge as given was inadequate under *Scindia.* The evidence required a more detailed instruction describing the limits of the shipowner's duty to intervene during the cargo operation in respect of the danger posed by the open hatch and unlit hold. Evisea was entitled to the substance of an instruction that even if it knew of the danger posed by the open hatch and the unlit hold, it would nevertheless not be negligent in failing to intervene in the stevedoring operation if it did not also know that the stevedore was itself imprudently disregarding the dan-

ger.[3] *See Scindia,* 451 U.S. at 175, 101 S.Ct. at 1626 (no shipowner liability if stevedore's "obviously improvident" exercise of judgment not known); *Kakavas,* 789 F.2d at 120 (failure to give such an instruction in comparable case reversible error); *Hunter v. Reardon Smith Lines,* 719 F.2d 1108, 1112–13 (11th Cir.1983) (same).

IV

In summary, we hold that although the evidence sufficed to support a jury verdict against Evisea on a theory of negligent failure to intervene, Evisea was prejudiced by the district court's failure properly to instruct the jury on that issue. We therefore affirm the district court's refusal to direct a verdict or grant judgment notwithstanding the verdict for Evisea, but we reverse and remand for a new trial because of the faulty jury instruction.

REVERSED AND REMANDED FOR NEW TRIAL

---

**3.** *Compare, e.g.,* the model instructions fully describing the vessel's duties under *Scindia* in 4 L. Sand, J. Siffert, S. Reiss, J. Sexton & J. Thorpe, *Modern Federal Jury Instructions* ¶ 85.01, instructions 85–5 to 85–7 (1985) *with* the model instructions in E. Devitt and C. Blackmar, *Feder-*al Jury Practice and Instructions (3d ed. 1977), which recently have been withdrawn as inadequate. *Id.* § 96.35 (Supp.1986). *See also Kakavas,* 789 F.2d at 120 (contrasting the two sets of model instructions to illustrate comparable error).