Thomas E. HARRIS, Plaintiff,

v.

PACIFIC-GULF MARINE, INC., Defendant.

Action No. 2:96CV1221.

United States District Court, E.D. Virginia, Norfolk Division.

June 11, 1997.

Sherman Carl Smith, Newport News, VA, for plaintiff.

Denham Arthur Kelsey, Hunton & Williams, Norfolk, VA, for defendant.

## OPINION AND ORDER

MILLER, United States Magistrate Judge.

This matter comes before the Court on motion by the defendant for summary judgment. All the parties have consented to have all proceedings in this case conducted before a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) and Fed.R.Civ.P. 73.

## I. *FACTUAL AND PROCEDURAL BACKGROUND*

The plaintiff in this case, Thomas E. Harris ("Harris"), alleges he was injured during

cargo operations being performed on the *S.S. Fred G* on December 22, 1993.[1] On the day of the accident, Harris was serving as a longshoreman for Ryan–Walsh, Inc., a stevedoring company providing cargo loading and unloading services to vessels calling on the Port of Hampton Roads.

Defendant in this action, Pacific–Gulf Marine, Inc. ("Pacific–Gulf"), alleges that it is not the registered owner of the *S.S. Fred G,* and that at the time of the alleged incident Zoella Shipholding, Inc. ("Zoella") owned the vessel. Zoella is a subsidiary of Pacific–Gulf, but the two companies are not one and the same. At the time of the accident the companies had independent financial structures.

Before, during and after the accident, Pacific–Gulf served as a general agent for Zoella, which maintained exclusive ownership and title of the *S.S. Fred G.* An Operating Agreement between Pacific–Gulf and Zoella set forth Pacific–Gulf's responsibilities as general agent, which included recruiting the ship's officers and crew and operation of the ship solely in accordance with Zoella's instructions. Under the Operating Agreement, Zoella retained exclusive liability for any personal injuries occurring on the *S.S. Fred G.* Pacific–Gulf maintains that paragraph 7(a) of the Operating Agreement states that the "operation and use of the Vessel in the performance of this Agreement shall be at the sole risk of the Owner and the Owner shall be responsible for any and all claims . . .".

On the date of the alleged incident, Harris was not working under the instructions, directions, or supervision of the officers or crew members of the *S.S. Fred G.* Rather, Harris worked as a lasher whose job responsibilities were governed by the Hampton Roads Longshoreman's Agreement negotiated between the International Longshoreman's Association, AFL–CIO, and the Hampton Roads Shipping Association ("ILA Contract").

Under the ILA Contract, all loading, unloading, and lashing of cargo on vessels calling on the Port of Hampton Roads must be performed exclusively by ILA longshoremen. Neither the stevedore nor the vessel can use non-ILA labor (including seamen) to perform any loading, unloading, or lashing services to the vessel while in the Port of Hampton Roads. In addition, Harris's employer, Ryan–Walsh, had an obligation to comply with the Safety and Health Regulations for Longshoring. 29 C.F.R. §§ 1918.1–1918.106.

On the date of Harris's alleged accident, December 22, 1993, Ryan–Walsh and its longshoremen exclusively conducted the cargo loading, unloading, and lashing operations aboard the *S.S. Fred G.* Neither the shipowner, its officers or crew, nor any of its representatives or agents had any active or physical involvement in the stevedoring operations being conducted by Ryan–Walsh on the *S.S. Fred G.* Harris was under the exclusive control and direction of Ryan–Walsh.

Stevedoring operations on the *S.S. Fred G* began around 7:00 a.m. on December 22, 1993. At that time, the Ryan–Walsh Superintendent for that ship, Dennis Martin, boarded the vessel. Company policy required Martin to inspect the vessel and its equipment to ensure that the Ryan–Walsh longshoremen would be able to load and unload the ship safely. At no time on December 22, 1993, did Martin report to either Ryan–Walsh or to the ship's officers any concerns about the condition of the *S.S. Fred G* presenting any unreasonable safety risks to the longshoremen. The vessel was found to be completely safe for the intended longshoring activities.

Under the stevedore's company policy, if Martin had determined that any of the working areas were inadequately illuminated or if any of the longshoremen had complained about the lighting, Ryan–Walsh would have ensured that additional lighting be provided. It is the customary practice in the Port of Hampton Roads for the stevedore to ensure that the lighting on cargo ships is safe and adequate. OSHA regulations impose on the stevedore the duty to ensure that "[a]ll walking and working areas . . . be adequately illuminated." 29 C.F.R. § 1918.92(a). Be-

---

1. The facts outlined in this section are taken in part from that portion of Defendant's Motion for Summary Judgment entitled "Statement of Un-disputed Facts Pursuant to E.D.Va. Local Rule 56(B)" and in part from that section entitled "Defendant Pacific–Gulf Marine".

fore, during, and after the stevedoring operations on December 22, 1993, Ryan–Walsh concluded that the *S.S. Fred G* was in such condition that it, as an expert and experienced stevedore, could carry out the cargo operations with reasonable safety.

Harris filed a complaint on December 20, 1996, two days before the three-year statute of limitations expired, alleging injuries sustained in an accident which supposedly occurred at 2:00 p.m. on December 22, 1993. According to Harris, a loose chain was across the edge of timber it was bundling, and Harris did not see the chain and slipped on it. Harris claims that a container on top of the ship blocked the natural light from illuminating the lower hold. Although Harris never notified any officer or crew member of the *S.S. Fred G* of the alleged accident, he promptly filed a claim against Ryan–Walsh seeking worker compensation benefits under the Longshore Harbor Workers Compensation Act ("LHWCA"). Over time Harris has collected more than $63,000 in compensation benefits.

This matter comes before the Court on a motion by the Defendant, Pacific–Gulf. Pacific–Gulf filed this Motion for Summary Judgment on May 8, 1997, and as of this date no response has been received by the Court from Harris.

After a review of the memorandum submitted by Pacific–Gulf, and the applicable statutory and case law, the Court GRANTS Pacific–Gulf's motion for summary judgment.

## II. *STANDARD FOR A SUMMARY JUDGMENT MOTION*

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine issue as to any material fact and the ... moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). For the evidence to present a "genuine" issue of material fact, it must be "such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Facts are deemed material if they might affect the outcome of the case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct.

2548, 91 L.Ed.2d 265 (1986). In other words, the moving party's submission must foreclose the possibility of the existence of facts from which it would be open to a jury to make inferences favorable to the non-movant. *Id.*

In deciding a summary judgment motion, the court must view the record as a whole and in the light most favorable to the non-moving party. *Terry's Floor Fashions, Inc. v. Burlington Indus., Inc.*, 763 F.2d 604, 610 (4th Cir.1985). Either party may submit as evidence "pleadings, depositions, answers to interrogatories, and admissions on file, together with ... affidavits" to support or rebut a summary judgment motion. Fed. R.Civ.P. 56(c). Supporting and opposing affidavits must be based on personal knowledge and must set forth facts that would be admissible in evidence. *Id.* at 56(e). Furthermore, the party moving for summary judgment need not supply "affidavits or other similar materials negating the opponent's claim." *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553.

Rule 56 mandates a grant of summary judgment against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552. The party who bears the burden of proving a particular element of a claim must "designate 'specific facts showing there is a genuine issue for trial'" with respect to that element. *Id.* at 324, 106 S.Ct. at 2553 (quoting Fed.R.Civ.P. 56(e)).

When a motion for summary judgment is made and supported by affidavits as provided for in Rule 56, an adverse party may not rest upon mere allegations or denials of the moving party's pleadings. Rather, the rule requires the nonmoving party's response, by affidavits or as otherwise provided for in Rule 56, to set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment if appropriate, should be entered against the nonmoving party. Fed.R.Civ.P. 56(e); *Atkinson v. Bass*, 579 F.2d 865, 866 (4th Cir.), *cert. denied*, 439 U.S. 1003, 99 S.Ct. 615, 58 L.Ed.2d 679 (1978).

In addition, the opposing party is entitled under Rule 56(f) to set forth in an affidavit reasons why he is presently unable to present by evidentiary affidavit facts essential to justify his opposition. Fed.R.Civ.P. 56(f); *Atkinson*, 579 F.2d at 866. If the reasons are adequate, the trial judge has broad discretion to determine whether to deny the motion for summary judgment, order a continuance, or make some other just disposition. *Id; see also Evans v. Technologies Applications & Service Co.*, 80 F.3d 954, 961 (4th Cir.1996).

With these controlling principles in mind, the Court turns to the merits of the motion.

### III. *ANALYSIS*

In Pacific–Gulf's Motion for Summary Judgment, certain facts are set forth which exonerate Pacific–Gulf from liability in this case. Local Rule 10(F)(2) requires a party in its brief in response to a motion for summary judgment to list all material facts as to which it is contended that there exists a genuine issue necessary to be litigated. Rule 10(F)(2) also permits the Court to assume that the facts identified by the moving party in its listing of material facts are admitted if such facts are not controverted in the statement of genuine issues filed in opposition to the motion. Harris has failed to respond to the summary judgment motion. Accordingly, this Court assumes that all facts set forth by the moving party, Pacific–Gulf, are admitted as true.

Since no response to the Motion for Summary Judgment has been received by this Court, summary judgment may be appropriate in this case. Pacific–Gulf contends that Harris sued the wrong party in this action, since Pacific–Gulf served as a general agent for the *S.S. Fred G*, not its registered owner. Pacific–Gulf further argues that even if it were the owner of the *S.S. Fred G*, Harris has failed to establish any violations for which Pacific–Gulf could be held liable. Harris has not denied these facts, nor has he provided information or evidence to the contrary.

Under Rule 56, an adverse party may not rest upon mere allegations or denials of the moving party's pleadings. Rather, the non-

moving party is required, by affidavits or as otherwise provided for in Rule 56, to set forth specific facts showing that there is a genuine issue for trial. If such a response is not received by the court, summary judgment may be granted if appropriate. Harris has failed to set forth facts which indicate there to be a genuine issue for trial. Accordingly, summary judgment is appropriate pursuant to Rules 56 and 37 of the Federal Rules of Civil Procedure. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2554–55, 91 L.Ed.2d 265 (1986); *Stillman v. Edmund Scientific Co.*, 522 F.2d 798, 801 (4th Cir.1975); *Dunham v. Hotelera Canco S.A. de C.V., et al.*, 933 F.Supp. 543, 552 (E.D.Va. 1996).

### A. *Pacific-Gulf's Status as General Agent Precludes the Imposition of Liability*

Lloyd's Register of Ships, the leading register of shipping, identifies Zoella as the owner of the *S.S. Fred G* and Pacific–Gulf as the general agent. Lloyd's Register of Ships 1466 (1995–96). Harris has failed to contest the fact that Pacific–Gulf is the general agent for Zoella, the actual owner of the vessel *S.S. Fred G*. Accordingly, the Court will assume that the agency relationship between Pacific–Gulf and Zoella has been admitted by Harris.

 Under maritime law, Pacific–Gulf cannot be held liable for injuries allegedly sustained aboard the vessel, whereas the shipowner, Zoella, can be held liable. "[T]he ship's general agent has been held not to be in that degree of possession and control so as to be liable for injuries occurring aboard the vessel." *Randolph v. Waterman Steamship Corp.*, 166 F.Supp. 732, 734 (E.D.Pa.1958), citing *Caldarola v. Eckert*, 332 U.S. 155, 67 S.Ct. 1569, 91 L.Ed. 1968 (1947). The facts of this case closely resemble those presented in *Caldarola v. Eckert*, in which the Supreme Court held that general agents of vessels cannot be found liable for longshoreman injuries. *Caldarola*, 332 U.S. at 159, 67 S.Ct. at 1571. It is clear to this Court that Harris cannot recover against Pacific–Gulf due to

the general agency relationship which exists between Zoella and Pacific–Gulf.

B. *Even If Pacific–Gulf Were The Ship-owner, It Cannot Be Held Liable Because The Stevedore is Ultimately Responsible for Injuries Sustained By Its Employees.*

The Longshore Harbor Workers Compensation Act ("LHWCA") provides a comprehensive federal workers' compensation program to longshoremen and their families. 33 U.S.C. § 901 *et seq; see Howlett v. Birkdale Shipping Co., S.A.,* 512 U.S. 92, 96, 114 S.Ct. 2057, 2062, 129 L.Ed.2d 78 (1994). The employer, usually an independent stevedore, is statutorily liable to any longshoreman who suffers disability or death "upon navigable waters of the United States."[2] 33 U.S.C. § 903. The LHWCA shields the employer from any further liability. 33 U.S.C. § 905(a). However, the Act allows the longshoreman to bring a third party action against the owner of the vessel if the injuries were caused by the vessel's negligence. 33 U.S.C. § 905(b).

■■■ The 1972 amendments to the LHWCA abolished the longshoreman's right to recover from the shipowner for unseaworthiness, and restructured the third-party action.[3] "The design of these changes was to shift more of the responsibility for compensating injured longshoremen to the party best able to prevent injuries: the stevedore-employer." *Howlett,* 512 U.S. at 97, 114 S.Ct. at 2063. Congress left the standard of care in § 905(b) for determination by the courts, and the Supreme Court clarified the standard in *Scindia Steam Nav. Co., Ltd. v. De Los Santos,* 451 U.S. 156, 166–75, 101 S.Ct. 1614, 1621–26, 68 L.Ed.2d 1 (1981). The shipowner owes the duty to:

(1) exercise "ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the

exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property," including the duty to warn the stevedore of any hidden dangers which he knew or should have known about and which were unknown to the stevedore or the stevedore would not become aware of or anticipate, *Id.* at 167, 101 S.Ct. at 1622,

(2) exercise due care with respect to the safety of the longshoremen if the vessel becomes actively involved in the cargo operation, *Id.,* and

(3) intervene if he knew or should have known that the stevedore's decision to continue operations despite a known hazard was "obviously improvident". *Id.* at 175, 101 S.Ct. at 1626.

The court later labeled these duties the turnover duty, the active control of the vessel duty, and the duty to intervene. *Howlett,* 512 U.S. at 98, 114 S.Ct. at 2063.

### (i) *Turnover Duties*

■■ Maritime law presumes the stevedore to be both expert and experienced, and as such the shipowner is entitled to rely on the stevedore's judgment in deciding whether an obvious hazard can be negotiated in a safe manner. *Scindia,* 451 U.S. at 175, 101 S.Ct. at 1626. A shipowner can reasonably rely on "the stevedore-employer's supervision of its own employees in their interaction with, and avoidance of 'obvious' or 'anticipated' hazards foreseeably associated with stevedoring on board the owner's vessel." *Keller v. United States,* 38 F.3d 16, 24 (1st Cir.1994). A shipowner "must have actual knowledge that it could not rely on the stevedore to protect its employees and that if unremedied the condition posed a substantial risk of danger." *Burchett v. Cargill, Inc.,* 48 F.3d 173, 179 (5th Cir.1995), citing *Randolph v. Laeisz,* 896 F.2d 964, 971 (5th Cir.1990).

The Fourth Circuit addressed turnover duties in *Bonds v. Mortensen and Lange,* 717 F.2d 123, 1984 AMC 1400 (4th Cir.1983). A

---

**2.** Navigable waters include any "adjoining pier, wharf, ... used by an employer in loading, unloading...." 33 U.S.C. § 903(a).

**3.** "In the event of injury to a person covered under this Act caused by the negligence of a

vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party...." 33 U.S.C. § 905(b).

**164**

longshoreman suffered fatal injuries when a gantry bell malfunctioned. *Id.* This bell was supposed to sound a warning any time a certain crane moved. *Id.* at 124. Because of the design of the crane and the malfunctioning bell, the longshoreman was unable to get out of the way of the moving crane in time, and he was crushed. *Id.* The Court found that the bell had been malfunctioning at the commencement of stevedoring operations which was three days prior to the accident. *Id.* at 127. Consequently, the court held the malfunctioning bell and the ship's design were obvious and known to all. *Id.*

Stating that "the shipowner may rely on the stevedore in the first instance to avoid exposing the longshoremen to unreasonable hazards," the Fourth Circuit held the shipowner was not negligent when he turned over the vessel to the stevedore knowing the gantry bell was malfunctioning. *Id.* at 127–28.

■ In this case, the issue of poor lighting in the lower hold does not constitute a hidden danger. Under maritime law, Pacific–Gulf was entitled to rely on the judgment of Ryan–Walsh on December 22, 1993 to continue stevedoring operations. Pacific–Gulf did not breach its turnover duties.

### (ii) *Active Involvement*

■ A shipowner exposes itself to liability when it "negligently injures a longshoreman" by exercising "active control" over the stevedoring operations. *Scindia,* 451 U.S. at 167, 101 S.Ct. at 1622. However, the mere presence of crew members on deck during stevedoring operations is insufficient to implicate the active control duty as a matter of law, even if the crew members had the authority to intervene in the event an unsafe condition developed. *Bonds,* 717 F.2d at 127, n. 4. After turnover occurs, "the shipowner has no continuing duty to inspect or supervise cargo operations conducted by the steve-

dore". *Kirsch v. Plovidba,* 971 F.2d 1026, 1029–30 (3d Cir.1992). Accordingly, active control requires direct intervention with cargo operations by the shipowner.

■ Pacific–Gulf had no active involvement in, nor control over, Ryan–Walsh's stevedoring operations. No evidence has been presented of active involvement by Pacific–Gulf in the cargo operations of Ryan–Walsh on December 22, 1993. Stevedoring activities began at 7:00 a.m. with the inspection of the vessel by the Ryan–Walsh superintendent. The longshoremen, including Harris, began their work following the investigation, and were under the direction and control of Ryan–Walsh, not Pacific–Gulf, when the accident occurred.[4]

### (iii) *Duty to Intervene*

■ The shipowner has a duty to intervene when a stevedore's decision to continue operations despite a known hazard presents an unreasonable risk of harm to the longshoremen. *Scindia Steam Nav. Co.* at 176, 101 S.Ct. at 1626–27. The Fourth Circuit grants stevedores extensive discretion in determining which hazards present an unreasonable risk of harm to the longshoremen.

The stevedore in *Bonds* continued operations with the knowledge that the gantry bell was malfunctioning,

> "[the stevedore] obviously concluded that these conditions did not pose an unreasonable risk of harm, for the longshoremen proceeded to unload the ship's cargo without complaint or incident until the time of the accident."

*Bonds,* 717 F.2d at 127. The Fourth Circuit stated there were safe alternatives available to the stevedore which would have avoided the accident, *id.* at n. 5, and the decision to continue operations was not "obviously improvident." *Id.* at 128.

4. The Fourth Circuit has held that a § 905(b) claim could go to the jury because of the active involvement of the vessel where a longshoreman sustained injuries from falling down an open hatch. *Hodges v. Evisea Maritime Co., S.A.,* 801 F.2d 678, 683, 1987 A.M.C. 511 (4th Cir.1986). Evidence was presented that lights had been turned out in the area of the accident by a crew

member, that it was the vessel's duty to close the hatches, that the hatch involved had been left open for the convenience of the crew, and that the longshoremen had completed stevedoring activities in the area. *Id.* The Court determined there was sufficient evidence that the vessel was in control of the area of the accident to create a jury issue regarding the vessel's negligence. *Id.*

Only the most egregious decisions by the stevedore are "obviously improvident," and give rise to the shipowner's duty to intervene. In the present case, the alleged lighting inadequacies on the *S.S. Fred G* do not raise a triable issue of obvious improvidence. No representatives of Ryan–Walsh ever complained to anyone about the level of lighting in the lower hold. Even after the alleged accident, the longshoremen continued their work without a word of complaint about their ability to see what they were doing. Pacific–Gulf had no indication that a "hazard" existed on board the vessel. The evidence does not support a finding that Ryan–Walsh's decision to proceed with stevedoring operations on December 22, 1993 was "obviously improvident." Therefore, Pacific–Gulf did not breach its duty to intervene.

## IV. *CONCLUSION*

For the foregoing reasons, the Court GRANTS Pacific–Gulf's motion for summary judgment and ORDERS the Clerk to enter judgment in favor of the defendant.

The Clerk shall mail a copy of this Opinion and Order to all counsel of record.