896 F.2d 1367
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Theola Jean POWERS, Guardian of Lowell E. Powers,
Incapacitated, Plaintiff-Appellant,
v.
UNITED STATES of America, Defendant-Appellee.
 No. 89-2073.
 United States Court of Appeals, Fourth Circuit.
 Argued: Dec. 4, 1989.
Decided: Feb. 9, 1990.
 
 Leonard Davis Levine (Pender & Coward, on brief), for appellant.
 Michael Anson Rhine, Assistant United States Attorney (Henry E. Hudson, United States Attorney, on brief), for appellee.
 Before ERVIN, Chief Judge, WILKINSON, Circuit Judge, and JAMES H. MICHAEL, Jr., United States District Judge for the Western District of Virginia, sitting by designation.
 PER CURIAM:
 
 
 1
 Theola Jean Powers ("Mrs. Powers") brought this suit pursuant to the Federal Tort Claims Act, 28 U.S.C. Sec. 1346(b), seeking damages from the United States for the allegedly negligent medical care afforded her incapacitated husband, Lowell E. Powers ("Powers"), a retired military serviceman, by a medical facility operated by the Navy. Following a trial on the merits, the district court, sitting without a jury, held that the medical care provided by the government's doctors to Powers was not negligent. Accordingly, the lower court entered final judgment in favor of the government, and this appeal followed. Because the decision of the court below is not clearly erroneous, it is hereby affirmed.
 
 I.
 
 2
 Powers retired from the United States Navy in February of 1970 after obtaining the rank of Master Chief Petty Officer. Following his retirement from the military, Powers was employed as a real estate broker in Virginia Beach, Virginia, where he and Mrs. Powers live. Powers is now 61 years old. As a retired serviceman, Powers remained eligible for and continued to receive primary medical care from the Navy. From May of 1977 until May of 1986, Powers was being treated for hypertension, high blood pressure, and related weight problems at the Internal Medicine Clinic at the Portsmouth Naval Hospital (the "Hospital") in Virginia. On February 22, 1979, during a routine follow-up visit for his hypertension, Powers first complained of brief episodes of numbness and parathesias in his left arm, hand and foot. Parathesias is an abnormal or impaired skin sensation, such as burning, prickling, itching, or tingling. Over the course of the next seven years, Powers had similar symptoms and problems from time to time with varying degrees of severity. Throughout this period of treatment, Powers' attending physicians believed that he most probably was suffering from transient ischemic attacks stemming from an as yet undetermined vascular disease such as a narrowing of the carotid artery. A transient ischemic attack is an episodic diminution of one's blood supply to a localized area of the body caused by a blocked or ruptured blood vessel. In due course, however, Powers was diagnosed as suffering from acoustic neuroma or cerebellar pontine angle tumor, a benign brain tumor which develops in the ear tunnel or adjacent areas of the brain.
 
 
 3
 When Powers first indicated that he was experiencing numbness and parathesias, his treating physician at the time, Dr. Davis, ordered that a radionuclide brain scan be performed. Although the radionuclide brain scan was a widely used diagnostic test at that time, it has since been supplanted by the more familiar computerized axial tomograph scan (commonly referred to as CAT or CT scan). The results of the radionuclide brain scan were inconclusive, and Powers' doctors focused their treatment on what they uniformly believed were vascular-related problems.
 
 
 4
 The following is a synopsis of Powers' subsequent visits to the Internal Medicine Clinic of the Hospital. On March 19, 1979, Dr. Davis examined Powers after the results of his brain scan were available. He had no further numbness at that time. Powers returned for a follow-up visit approximately four months later on July 29, 1979, at which time the examining physician noted that his left arm parathesias had disappeared along with a forty-pound weight loss. His next visit to the doctor occurred six months later on January 29, 1980. At that time, Powers informed his physician that he no longer had any numbness. At his following appointment on September 15, 1980, Powers again related no complaints of numbness to the examining physician, Dr. Finnerty. On April 15, 1981, for the first time in two years, Powers complained to Dr. Finnerty of occasional numbness in his left arm and coldness in his left index finger. Dr. Finnerty referred Powers to the Vascular Surgery Clinic of the Hospital. He was examined there on July 21, 1981, and August 25, 1981, at which times a vascular surgeon conducted a neurological examination and certain other non-invasive tests. The results of the tests were all normal. Thereafter, Powers saw Dr. Finnerty once more on July 7, 1982. During that visit, Powers had no complaints of numbness or parathesias, and Dr. Finnerty evaluated his medical condition as asymptomatic. More than a year later, on September 13, 1983 and October 4, 1983, Powers saw Dr. Tiernan and complained on both occasions of numbness in his upper left extremity and in certain fingers of the left hand. For a second time, Powers was referred to the vascular surgery clinic, where he was examined on October 25, 1983. The specialists there again found that Powers suffered from no operable vascular disease and discharged him. His numbness was attributed to degenerative joint disease. On a follow-up visit with Dr. Tiernan on November 9, 1983, Powers reported that the occurrences of numbness in his upper left torso were rare. Dr. Tiernan examined Powers at six-month intervals on May 14, 1984, January 16, 1985 and June 19, 1985. On each of these occasions, Powers indicated no numbness whatsoever. Powers also had no complaints during his last routine follow-up visit with Dr. Roberts on March 31, 1986.
 
 
 5
 Powers' medical mystery ended in May of 1986. On May 13, 1986, Powers went to the Boone Clinic in Virginia Beach, complaining of a "most profound" numbness in both his face and his left-side extremities. These symptoms were also accompanied earlier by a severe and long-lasting headache. Powers indicated that he almost never had headaches, and that his headache had lasted a full day. He was seen by Dr. Fairchild, who consulted with Dr. Morte, a neurologist at the Hospital. Drs. Fairchild and Morte decided to transport Powers to the Hospital for tests to determine whether he was suffering from a transient ischemic attack or a stroke in evolution. Dr. Morte ordered that Powers be admitted to the Hospital, that he undergo an arteriogram and a CAT scan, and that he be examined by a vascular specialist.
 
 
 6
 The CAT scan revealed to Powers and his doctors, for the first time, a 3-4 centimeter tumor which was lodged in the left side of Powers' brain. The tumor had wrapped around his basilar artery, penetrated the left auditory canal, and started to displace his brain stem. Surgeons at the hospital attempted to remove the brain tumor during a marathon 20-hour operation, which left the patient in a comatose and incapacitated state. Powers remains in that condition today.
 
 
 7
 Mrs. Powers, as guardian of her incapacitated husband, brought this suit for damages against the United States claiming that the medical treatment which her husband received from government physicians at the Hospital since 1979 was negligently provided. In particular, she alleges that if a CAT scan had been performed much earlier in the examination-diagnosis-treatment process, the brain tumor could have been discovered as early as 1979, and successfully removed through surgery and treatment. Thus, Mrs. Powers maintains that the medical care provided to her husband fell below the applicable medical standards.
 
 
 8
 A bench trial was conducted in this case on March 22-23, 1989. The parties presented conflicting expert testimony relating to the medical care provided to Powers. The issues in dispute were whether a CAT scan should have been ordered as part of Powers' diagnostic work-up prior to the Spring of 1986, and whether an earlier diagnosis of the brain tumor would have resulted in better medical care. Based on the evidence adduced at trial, the district court made the following express findings of fact: (1) the expert medical opinions of the government's doctors were much more credible and persuasive than those of the plaintiff's physicians; (2) the plaintiff failed to establish a causal connection between an earlier detection of a tumor and a more successful excision; (3) the standard of medical care for the treatment of numbness and parathesias by a primary care physician in the State of Virginia required neither a neurological consultation nor a CAT scan; (4) the medical treatment given to Powers and the diagnostic techniques applied in this case satisfied the reasonable care standard existing under Virginia law; (5) Powers reported no symptoms which suggested to anyone, including the plaintiff's expert witnesses who examined this case in hindsight, that he had a tumor; (6) the conclusion of the Hospital's doctors that Powers' problem was most likely vascular in nature was medically justified and not contested by the plaintiff's experts; and (7) CAT scans, while available in 1979, did not come into general medical use until well after that time. Based on these findings of fact, Judge Clarke concluded that Powers did not receive negligent medical care at the Hospital. Accordingly, the court entered judgment in favor of the government. Mrs. Powers now appeals this decision.
 
 II.
 
 9
 Medical negligence is an issue of fact to be resolved by the trial court, whose determination in this matter must be sustained on appeal absent clear error as defined by Fed.R.Civ.P. 52(a). Bonds v. Mortensen & Lange, 717 F.2d 123, 125 (4th Cir.1983); Famous Knitwear Corp. v. Drug Fair, Inc., 493 F.2d 251, 253 (4th Cir.1974).* Although reasonable minds examining the record in this case could reach different conclusions with respect to whether the medical care provided to Powers by the government's doctors was negligent, we do not believe that the district court was clearly erroneous in absolving the government's doctors of medical negligence in this case. The applicable standard of review requires this court to sustain the district court's findings with regard to negligence in almost all but the most exceptional cases of clear error. In this case, the trial court was presented with the conflicting, yet equally convincing, testimony of the parties' expert medical witnesses. Furthermore, Powers' symptomology did not point to the existence of a tumor--there was no progressive worsening of his parathesias. Thus, the outcome below is legally defensible in light of the broad discretion that a district court has as the trier of fact, and the narrow review imposed upon this court by Rule 52(a). All things considered, the judgment below must be
 
 
 10
 AFFIRMED.
 
 
 
 *
 Mrs. Powers argues that, under this court's decision in Hicks v. United States, 368 F.2d 626 (4th Cir.1966), medical negligence is a question of law which is freely reviewable on appeal. By its own terms, however, Hicks does not apply to the case at bar. Hicks stands for the narrow proposition that, if a judge's conclusions are based on undisputed facts, a final determination by a trial court on the issue of negligence is not subject to the clearly conflicting medical testimony and other inconsistent evidence to the court below. As we noted in Bonds, moreover, the "[m]ore recent decisions in our Circuit indicate that the ruling in Hicks on this point has to a large degree been abandoned, and indicate that a district court's findings of negligence are generally treated as findings of fact reviewable under Fed.R.Civ.P. 52(a)." 717 F.2d at 125