**Nick KAKAVAS, Plaintiff-Appellee,**

v.

**FLOTA OCEANICA BRASILEIRA, S.A.,
Defendant-Appellant.**

**No. 678, Docket 85–7802.**

United States Court of Appeals,
Second Circuit.

Argued Jan. 6, 1986.

Decided April 23, 1986.

Victor S. Cichanowicz, New York City (Cichanowicz, Callan, & Keane, New York City), for defendant-appellant.

Thomas Stickel, New York City (Lipsig, Sullivan, Liapakis, P.C., New York City), for plaintiff-appellee.

Before FEINBERG, Chief Judge, and FRIENDLY* and WINTER, Circuit Judges.

FRIENDLY, Circuit Judge:

This appeal from a judgment entered on a jury verdict in the District Court for the Southern District of New York, Morris E. Lasker, *Judge*, requires us to apply the principles enunciated by the Supreme Court in *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981), to the question of the extent of a shipowner's duty to anticipate and warn of or take steps to prevent a hazardous condition that develops during the course of repair work carried out on board ship by employees of an independent contractor. The jury found defendant Flota Oceanica Brasileira, S.A. ("Flota"), owner of the merchant vessel Frotasul, 100% liable under § 905(b) of the Longshoremen's and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § 901 *et seq.*, for personal injuries sustained by plaintiff Nick Kakavas in the course of his performing repair work on board the Frotasul and awarded him compensatory damages in the amount of $2,000,000. Flota's principal contention on appeal is that the district judge erred in charging the jury that Flota had a continuing duty to furnish and maintain a reasonably safe place of work rather than, as Flota had requested, that the primary responsibility for Kakavas' safety rested with his employer, an independent ship repair contractor, and that Flota was entitled to rely on the employer to take the precautions necessary to avoid exposing Kakavas to hazards that might develop in the course of the repair work. Because we agree with Flota that the judge's instructions to the jury did not adequately express the nature and extent of a shipowner's duty in these circumstances and that Flota's counsel sufficiently, albeit clumsily, brought this point to the judge's attention, we reverse and remand for a new trial.

* This opinion is substantially in the form written by Judge Friendly before his death on March 11, 1986.

The jury could fairly have found the facts to be as follows: The accident occurred while the Frotasul was docked at Port Houston, Texas. Kakavas was employed at the time as a repairman's helper by Stevens Technical Services ("Stevens"), an independent ship repair company that had been engaged for some seven weeks as general contractor in charge of various repairs on the Frotasul. Chief among Stevens' tasks had been the repair of the vessel's hatches and hatch covers, the latter of which had involved removing the covers, taking them ashore and replacing all the steel that needed to be replaced, and returning them to the ship and reassembling them, as well as removing, greasing, and reassembling the hatch cover wheels.

The hatch where the accident occurred, Hatch No. 4, was equipped with a MacGregor hatch cover; a brief explanation of its construction and operation will be helpful. The cover consists of six steel sections (or "pontoons"), each of which weighs approximately six tons and measures seven feet long from forward to aft and 37½ feet wide from starboard to port. The distance from the deck to the top of the hatch cover is five feet. The pontoons are connected by "pull/push rods," one on the starboard and one on the port side of each pontoon. A steel cable runs over the center of the hatch from a winch positioned on the deck at the forward end, through a pulley at the aft end, and back again to attach to a shackle at the forward edge of the first pontoon. Tension on the cable pulls the cover aft and opens the hatch; if the cable is unthreaded from the pulley and stretched directly between the winch and the shackle, tension on the cable pulls the cover in the opposite direction (forward) and closes the hatch.

As the hatch is being opened, the pontoons fold accordion-style on their sides into a well at the aft-end of the hatch. This is accomplished by a dual system of guide rails and wheels. On the starboard and port sides of each pontoon are two wheels—a "rolling wheel" and a "tipping wheel." The rolling wheel is larger and is located at the bottom aft corner of the pontoon. It rests on the "sliding rail" or "runway," a steel track running along the top of the port and starboard hatch walls. The sliding rail slopes downward to the deck just past the aft end of the hatch; thus, when each pontoon reaches that point, its rolling wheel runs off into the air. This causes the weight of the pontoon to shift to the tilting wheel, which is located near the upper edge of the pontoon and at its center of gravity. The tilting wheel rests on the "guide rail," which begins just short of the aft end of the hatch and is higher and narrower than the sliding rail. As the pontoon continues its motion aft, now resting on the guide rail, its aft end tips downward and its forward end upward and it folds against the other pontoons in the well.

The Frotasul was set to sail at midnight on November 2, 1979. At about 6:00 p.m. the port engineer,[1] Carlos Aguas, ordered all the hatches tested for watertightness. This involved opening each hatch, chalking the rubber gaskets around the cover, closing the hatch and tightening down the cover by means of cleats and wedges, spraying the cover with water, and then reopening it to see whether any chalk had been washed away. The ship's crew operated the winch to open and close the covers, applied chalk to the gaskets, and sprayed water on the covers; employees of Stevens reassembled the pontoons and tightened and untightened the cleats.

The crew reached Hatch No. 4 at about 9:30 p.m., started the winch motor, and began opening the hatch cover for testing. After only one or two pontoons had folded into the well, the cover ground to a halt: the push/pull rods on each side of the pontoon next in line to fold into the well had jammed against the inside edge of the sliding rail, preventing the cover from

<hr>

1. The port engineer is the representative of the shipowner and supervises repair of the vessel in port. Aguas was employed by Omnium Agency, a private company that was a general agent for Flota in this case.

opening any further. Port engineer Aguas was called to the scene and, after surveying the situation, concluded that the sliding rail, which Stevens had manufactured and installed, was too wide at the point where the push/pull rods had jammed. The decision was made to free the cover by burning away on each side of the hatch a six-inch piece of the sliding rail.[2] Apart from a consensus that the Stevens employees would perform the burning operation, there is no evidence that anyone present discussed the method by which the repairs would be carried out. Aguas left at once, and neither he nor any member of the crew was at the hatch when the repairs got underway or while they were being performed.

The work began on the port side. A Stevens welder using a portable acetylene torch knelt on top of the pontoon directly forward of the stuck pontoon, which had come to rest in a tilted position, and leaned over the edge to cut the sliding rail. Kakavas stood beside him holding a light. After freeing the port side, the two men moved to the starboard side and repeated the process. As soon as the starboard side was freed, the hatch cover began to move. Although the testimony of Kakavas and other witnesses was in conflict as to just how far the cover moved, the evidence adduced at trial was more than sufficient for the jury to credit Kakavas' version of what happened next: the pontoon on which he and the welder were standing jerked aft, causing him to lurch forward and to the side and his right leg to slip down over the edge of the pontoon onto the hot metal of the freshly cut sliding rail, where it was wedged in place by the rolling wheel of the next pontoon. Kakavas' cries and the commotion on deck brought Aguas and the crew running, but they could not move the hatch cover without first rerigging the winch cable to pull the cover forward. As soon as this was done, Kakavas' leg was freed and he was taken to a hospital. Medical testimony established that his right leg had been rendered virtually useless by the accident, that he would suffer continual pain, and that he was permanently disabled from physical work. Medical expenses amounted to $40,000, and lost wages prior to trial and for the 17 years of Kakavas' future work life amounted to approximately $525,000. No effort was made at trial by Kakavas to quantify damages for pain and suffering or by Flota to adjust for income tax or to discount to present value.

Kakavas' theory at trial and on this appeal is that the accident occurred because tension on the winch cable caused the hatch cover to move as soon as the stuck pontoon was freed; that the cable was taut because the ship's crew had left the hatch after the cover had jammed without releasing the winch; that Aguas and the crew knew or should have known that leaving tension on the cable created a non-obvious hazard that would be unavoidable by the Stevens employees repairing the hatch cover; and that Flota, through the failure of Aguas and the crew to take steps to correct this hazard, is liable in negligence for Kakavas' injuries.

Kakavas called an expert, Immo Nordstrom, an "independent ship surveyor" with experience in designing and repairing hatch covers, who testified that in his opinion it was not good and safe practice for Aguas to have left the hatch area while the repair work was going on because "he's the one who really knows how the winch operates." Nordstrom also testified that there were three possible places where the men could have stood to perform the repairs: on top of the pontoon, as they did; on the deck next to the pontoon, leaning over the guide rail; and on a wooden staging built up from the deck next to the hatch and extending over the guide rail. As to the first, Nordstrom said that it would have been safe to work from on top

---

2. Aguas testified that Kakavas was the acting foreman of the Stevens gang when the hatch cover jammed and that he and Kakavas discussed the problem and together decided to repair it by burning away part of the sliding rail. However, Kakavas denied that he was the acting foreman or that he had discussed the repairs with Aguas. The record shows that Kakavas speaks only Greek and Aguas speaks only English and Portugese.

of the pontoon only if the hatch cover had been completely closed—in other words, only if all tension had been removed from the winch cable. As to the second, he said that the men would have been no better off standing on the deck, since in that position the sudden movement of the hatch cover would have severed their arms. He concluded that the third method—working from a staging—would have been the safest course for the men to follow under the circumstances. He testified that stagings are often built to perform such repairs, that ship repairmen are quite familiar with them, and that it would have taken at least one hour to build one here.

At the close of Kakavas' case, Flota moved for a directed verdict. Flota's theory below and on this appeal is that, even if the hatch cover moved due to tension on the winch cable and even if that tension existed because the crew had failed to release the winch, a taut winch cable on a stuck hatch cover is not in and of itself a hazardous condition, but became so here only when Kakavas and the welder chose to stand on top of the cover; that their decision to free the cover from that position was unilateral and neither was nor could have been anticipated by Aguas and the crew; that Flota was under no duty to supervise the repairs and was entitled to rely on Kakavas' employer choosing a method for carrying them out that would best protect Kakavas and his fellow workers; and that Kakavas' injuries were the result of his own and his employer's negligence in failing to check on the condition of the winch cable before initiating repairs from on top of the hatch cover.

The district judge denied Flota's motion for a directed verdict. Flota's only witness was Aguas, who not only did not testify as an expert but said that he had never seen a stuck hatch cover prior to the incident in question. He testified that no one from Stevens had inquired as to the winch cable or had asked him to operate the winch, despite the fact that he and the crew had been available to do so at any time before and during the repairs. He also testified that he had not discussed with Kakavas how the repairs would be carried out and had not known that Kakavas would decide to work from on top of the hatch cover.

The judge, after explaining each party's theory of the case, instructed the jury on the law of negligence, contributory negligence, and damages as it related to the facts in evidence. We set forth in the margin the judge's charge regarding the duty owed by a shipowner to the employees of an independent contractor working on board his vessel.[3] The jury found, in answer to questions put by the court, that Flota was negligent, that its negligence was a proximate cause of Kakavas' injuries, that damages were $2,000,000, and that Flota had not established that Kakavas was negligent and that his negligence was a proximate cause of the injury. Flota

---

3. Now, the law is that it is the continuing duty of a shipowner to use ordinary care under the circumstances to furnish a person working aboard the ship with reasonably safe equipment and a reasonably safe place to work on the ship, and to use ordinary care under the circumstances to maintain and keep the place at [sic] work and the ship's equipment used in carrying on the work, in a reasonably safe condition.

This continuing duty to use ordinary care under the circumstances, owed by the shipowner to a person working aboard the ship, exists independently of and separate from any similar duty owed to the repairman by anybody else.

Now, although this is so, although the shipowner has such a duty, the mere fact that an accident has occurred does not mean that the shipowner is responsible for the accident or liable for the injury. Moreover, a shipowner is not an insurer of the safety of a repairman.

That means he is not legally called upon to guarantee 100 percent the safety of a repairman as the issuer of an insurance policy might be, and is under no duty to warn a repair company or its employees of any conditions which are open or obvious or known to them, or of conditions which can be observed by the repair people in the exercise of reasonable care.

The shipowner is not responsible to do that unless, however, the shipowner could reasonably anticipate that the repairman would be unable to avoid such a condition.

In other words, the law doesn't require a shipowner to warn somebody of something which they are bound to see themselves and which they can avoid.

moved for judgment notwithstanding the verdict or, in the alternative, for an order setting aside the verdict and for a new trial under Fed.R.Civ.P. 50(b) and 59. The motion was denied on September 11, 1985. Flota appeals from the judgment and from the order denying its motions.

## DISCUSSION

As is well known, *see Scindia*, 451 U.S. at 164–66, 101 S.Ct. at 1620–21, decisions prior to the 1972 Amendments to the LHWCA had produced an anomalous and intolerable situation with respect to actions by longshoremen and harbor workers against shipowners.[4] Under the doctrine of unseaworthiness an injured longshoreman could succeed in an action against the shipowner for almost any accident, even one occasioned by defective equipment supplied by the stevedore or faulty use of equipment by the stevedore's employees. A large portion of the award would go in payment of the fees of the plaintiff's attorney. A considerable portion—perhaps all—of the balance would go to the stevedore's insurer, to the extent of workmen's compensation payments to the plaintiff. When the stevedore had been negligent, the shipowner would generally be able to recover the amount of the award for the stevedore's breach of his express or implied warranty.

This scheme worked a series of frustrations. The plaintiff was generally remitted to the inadequate compensation payments under the LHWCA. The stevedore's insurer, who had collected premiums in the expectation of paying compensation, ended up paying nothing.[5] The stevedore, whose liability was to have been limited by § 905(a) to the workmen's compensation payments to the injured employee, paid the larger amounts awarded against the ship.

The 1972 Amendments, as Justice White succinctly put it in *Scindia*, 451 U.S. at 165, 101 S.Ct. at 1621, "changed this scheme of

things"—but only somewhat. Workmen's compensation benefits were increased. The longshoreman's action against the shipowner for unseaworthiness was abolished; so was the shipowner's third party action against the stevedore. However, the longshoreman's action against the shipowner for negligence was preserved, with the House committee report stating that the purpose for this was to place the injured longshoreman "in the same position he would be if he were injured in non-maritime employment ashore ... and not to endow him with any special maritime theory of liability or cause of action under whatever judicial nomenclature it may be called, such as 'unseaworthiness,' 'non-delegable duty,' or the like." H.R.Rep. No. 1441, 92d Cong., 2d Sess. (1972), *reprinted in* 1972 U.S.Code Cong. & Ad.News 4698, 4703. The House committee also stated that the definition of the vessel's negligence was left to be "resolved through the application of accepted principles of tort law and the ordinary process of litigation—just as they are in cases involving alleged negligence by land-based third parties." *Id., reprinted in* 1972 U.S.Code Cong. & Ad.News at 4704. Over time, more and more courts came to adopt §§ 343 and 343A(1) of the Restatement of Torts as the standard for shipowner negligence:

> § 343. *Dangerous Conditions Known to or Discoverable by Possessor*
>
> A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he
>
> > (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and
> >
> > (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and

---

**4.** We shall often use the term "longshoreman" to include all harbor workers and the term "stevedore" to include all employers of harbor workers.

**5.** At least this would have been true at the outset. In theory, recoveries by compensation insurers would in the long run work their way into premium reductions.

(c) fails to exercise reasonable care to protect them against the danger.

## § 343A. *Known or Obvious Dangers*

(1) A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness.

*See Scindia,* 451 U.S. at 180 n. 1, 101 S.Ct. at 1628 n. 1 (Powell, J., concurring, joined by Rehnquist, J.); *Evans v. Transportacion Maritima Mexicana,* 639 F.2d 848, 852–53 (2d Cir.1981). Less appropriately, some courts resurrected the notion that the owner had a "non-delegable duty" to furnish a safe place to work, despite congressional disapproval of this judicial nomenclature.

*Scindia* afforded the Supreme Court an opportunity to clarify the extent to which a shipowner's duty of care to warn of or eliminate a dangerous condition on board ship is qualified by his reasonable reliance on the expertise of the stevedore. The case involved injuries to a longshoreman employed by a stevedore to load cargo on the defendant's vessel: While working in the hold, the longshoreman was struck by cargo that fell from a pallet being held in suspension by a winch that was part of the ship's gear but was being operated by another longshoreman. The winch was allegedly defective and this was allegedly known by or obvious to both the stevedore and the shipowner for two days prior to the accident.

The basic theme of the *Scindia* opinion is the extensive reliance that a shipowner may justifiably place on an independent contractor. The ship's duty is "to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety." 451 U.S. at 167, 101 S.Ct. at 1622.

After analyzing the background of the 1972 Amendments and the positions of the parties, the Court rejected the view of the Court of Appeals for the Ninth Circuit that the vessel owed a duty to the longshoreman requiring it "to inspect or supervise the stevedoring operation." *Id.* at 168, 101 S.Ct. at 1622.

We are of the view that absent contract provision, positive law, or custom to the contrary—none of which has been cited to us in this case—the shipowner has no general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within the confines of the cargo operations that are assigned to the stevedore. The necessary consequence is that the shipowner is not liable to the longshoremen for injuries caused by dangers unknown to the owner and about which he had no duty to inform himself.

*Id.* at 172, 101 S.Ct. at 1624.[6]

Having placed the primary responsibility for safety during cargo operations square-

---

**6.** The Court explained:

As a general matter, the shipowner may rely on the stevedore to avoid exposing the longshoremen to unreasonable hazards. Section 41 of the Act, 33 U.S.C. § 941, requires the stevedore, the longshoremen's employer, to provide a "reasonably safe" place to work and to take such safeguards with respect to equipment and working conditions as the Secretary of Labor may determine to be necessary to avoid injury to longshoremen. The ship is not the common employer of the longshoremen and owes no such statutory duty to them. Furthermore, as our cases indicate, the steve-

dore normally warrants to discharge his duties in a workmanlike manner; and although the 1972 Amendments relieved the stevedore of his duty to indemnify the shipowner for damages paid to longshoremen for injuries caused by the stevedore's breach of warranty, they did not otherwise disturb the contractual undertaking of the stevedore nor the rightful expectation of the vessel that the stevedore would perform his task properly without supervision by the ship.

451 U.S. at 170, 101 S.Ct. at 1623 (footnote omitted).

ly on the independent contractor, the Court turned to "the more difficult and recurring issue involved in this case: What are the shipowner's duties when he learns that an apparently dangerous condition exists or has developed in the cargo operation, which is known to the stevedore and which may cause injury to the longshoreman? " *Id.* at 172–73, 101 S.Ct. at 1624–25. On this issue, the Court was less clear. It noted with disapproval the view of the Court of Appeals for the Ninth Circuit that "if the vessel should realize that the condition presents an unreasonable risk of harm, it is liable if it 'fails to exercise reasonable care under the circumstances' to protect the longshoreman." *Id.* at 174, 101 S.Ct. at 1625. It also noted the position of this court in *Evans*, 639 F.2d at 856, that, while mere knowledge of a dangerous condition would not suffice to fasten a duty to act on the shipowner, if the shipowner should anticipate that the stevedore will not or cannot correct the danger and that the longshoremen cannot avoid it, he is bound to take reasonable steps to obviate or neutralize the hazard. 451 U.S. at 174–75, 101 S.Ct. at 1625–26. The Court found itself unprepared to agree that a shipowner has precisely the duty described by us in *Evans*, though it did not foreclose the possibility that it might be so prepared at some future time. *See Lieggi v. Maritime Co. of the Philippines*, 667 F.2d 324, 328 n. 9 (2d Cir.1981). Rather than formulate a general rule, the Court held only that "there are circumstances in which the shipowner has a duty to act where the danger to longshoremen arises from the malfunctioning of the ship's gear being used in the cargo operations." *Id.*, 451 U.S. at 175, 101 S.Ct. at

1626. On the facts before it, the Court concluded that—even though the decision whether to continue using the winch "was a matter of judgment committed to the stevedore in the first instance"—the longshoreman was entitled to a jury trial because a jury might conclude that the winch was so clearly unsafe and the stevedore's decision to continue using it so "obviously improvident" that the shipowner had a duty to intervene, stop the loading operation and repair the winch. *Id.* at 175–76, 178, 101 S.Ct. at 1626–27.[7]

■ Mere reading of the judge's charge in the present action, *see supra* note 3, suffices to disclose how far it departed from the standards laid down in *Scindia*. Whereas the "basic thrust" of *Scindia* was to place "the primary burden on the stevedore for avoiding injuries caused by obvious hazards," *id.* at 180, 101 S.Ct. at 1628 (Powell, *J.*, concurring), the charge begins with an emphatic statement that just such a burden here rested on Flota. It suggested that the ship's equipment was unsafe whereas, unlike the ship's winch in *Scindia*, there was nothing unsafe about it. The ship's equipment had successfully performed its mission; what was unsafe was for Stevens to instruct its employees to stand on the hatch cover without first making sure that the winch cable was slack. The instruction was that the shipowner had a continuing duty to monitor the repair work; *Scindia* had stated the contrary. The instruction made "reasonable anticipation"—of something—the measure of the extent of the shipowner's duty to warn; *Scindia* had suggested that the test was "obviously improvident judgment" on the

---

7. Our analysis of *Scindia* has been taken from Justice White's opinion for the Court. Justice Brennan's concurring opinion, in which Justices Marshall and Blackmun joined, seems to differ only in requiring actual knowledge of the dangerous condition by the shipowner. 451 U.S. at 179, 101 S.Ct. at 1628. Justice Powell, writing for himself and Justice Rehnquist, characterized the "basic thrust" of the Court's opinion as "placing the primary burden on the stevedore for avoiding injuries caused by obvious haz-

ards." *Id.* at 180, 101 S.Ct. at 1628. He wrote separately only to emphasize the distinction between the Court's approach and the "reasonableness" standard of the Ninth Circuit:

> Only where the judgment of the stevedore is 'obviously improvident,' ... and this poor judgment either is known to the shipowner or reasonably should be anticipated under the circumstances, does the shipowner have a duty to intervene.

*Id.* (footnote omitted).

part of the stevedore. In short, whatever might be said of this charge in pre-*Scindia* and pre-*Evans* days—the judge himself referred to the charge as "antedated"—it did not properly put to the jury what the law now is.

The extent to which the charge diverged from *Scindia* is illustrated by the changes made in the relevant instruction in E. Devitt & C. Blackmar, *Federal Jury Practice and Instructions* (3d ed. 1977). The instruction recommended in the bound edition does not differ widely from that given here. *See id.* § 96.35. But in the most recent cumulative supplement, that instruction is withdrawn, with the explanation:

> The authors agree with experienced admiralty practitioners who have suggested that the text instruction is misleading, and very probably legally erroneous, in the light of the 1972 amendments to the Longshoremen and Harbor Workers Compensation Act, 33 U.S.C.A. § 905(b). The notes to the text are also inadequate and misleading, in that most cited cases were decided before the statute was amended.

*Id.* at 1124 (Supp.1985). Although a new instruction is not provided, the notes discuss *Scindia* and its progeny at length, stressing how they place the primary responsibility for safety during cargo operations on the stevedore and during repair operations on the independent contractor. An updated instruction, fully incorporating these principles, can be found in 4 L. Sand, J. Siffert, S. Reiss, J. Sexton & J. Thorpe, *Modern Federal Jury Instructions* ¶ 85.-01, instructions 85–6 & 85–7 (1985). The contrast with the charge given in the present action is apparent.

■ The question remains whether Flota's counsel adequately objected. When counsel were asked for any comments on the charge, Flota's counsel said that he had no exceptions to the charge as given, but did have requests to charge. Counsel had already submitted sixteen requests to charge. Although, as so often is the case, each was unduly favorable to the proponent, and it consequently was not error to refuse to give any one of them as asked, they should together have sufficed to alert the judge that the charge was inadequate under *Scindia*. The judge asked whether counsel wished merely to repeat these earlier requests. Counsel answered, "I certainly do. Would it be sufficient to show each one or is it sufficient—"; the judge interrupted, "It is sufficient on the record [that] you requested charges on those matters. It is sufficient by filing them. Is there anything specific at this time you wish to call to my attention?" Counsel responded by mentioning his second request to charge, which dealt with the primary responsibility of Stevens for the safety of its employees, and by referring broadly to "the basic principles enunciated by *Scindia*" and "the change in the law and the amendment by § 905(b)." We have held that a request for further instructions is equivalent to an objection to the charge, *Wright v. Farm Journal, Inc.,* 158 F.2d 976, 978 (2d Cir.1947). We conclude that Flota's requests to charge, when read in light of the earlier argument in support of Flota's motion for a directed verdict and the colloquy summarized above, were enough to alert the judge to the question whether his charge properly reflected the law as molded by *Scindia*.

The judgment is therefore reversed and the cause remanded for a new trial on liability and damages.