Alec MARCINOWSKI, Plaintiff,

v.

**McCORMACK BOYS CORPORATION, Great Lakes International, Inc., and Amboy Aggregates, Defendants.**

No. 96 CIV. 3739(PKL).

United States District Court, S.D. New York.

Sept. 4, 2001.

Joseph J. Perrone, DeOrchis, Walker & Corsa, LLP, New York City, for Amboy Aggregates.

John R. Geraghty, The Geraghty Law Firm, Hackensack, NJ, for McCorkmack Boys Corporation and Great Lakes International, Inc.

## OPINION AND ORDER

LEISURE, District Judge.

Plaintiff Alec Marcinowski commenced this action against McCormack Boys Corporation (hereinafter "McCormack"), Great Lakes International, Inc. (hereinafter "GLI"), and Amboy Aggregates (hereinafter "Amboy") to recover damages for injuries sustained aboard Scow MC–191, a sand barge owned and maintained by Amboy. Plaintiff, a deckhand aboard the tugboat *McCormack Boys,* injured his left knee when he fell through a cavity in the asphalt sand while climbing through the cargo area of Scow MC–191. Plaintiff sued McCormack, GLI, and Amboy for negligence under the Jones Act, 46 U.S.C.App. § 688 *et seq.* In addition, plaintiff alleged that defendants were strictly liable for the unseaworthiness of both *McCormack Boys* and Scow MC–191. McCormack and GLI (hereinafter the "cross-claimants") filed cross-claims against Amboy seeking (1) full indemnification for any liability to plaintiff resulting from Amboy's alleged breach of its implied warranty of workmanlike performance and (2) $30,213.72 in maintenance and cure payments they made to plaintiff. On February 27, 1998, plaintiff settled his claims with Amboy. In February of 2001, plaintiff settled his claims with GLI and McCormack. Therefore, GLI and McCormack's cross-claims against Amboy to recover (1) their $84,410.50 settlement with plaintiff and (2) $30,213.72 in maintenance and cure payments made to plaintiff were the only issues remaining for trial.

From April 23, 2001 through April 25, 2001, the Court conducted a bench trial regarding the disputed issues in this case, and the parties have subsequently submitted post-trial briefs further addressing these issues. Having considered the parties' post-trial submissions and the evidence presented at trial, the Court sets forth herein its findings of fact and conclusions of law, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## FINDINGS OF FACT

On October 10, 1994, Amboy employees loaded Scow MC–191 with 1,011 cubic yards of asphalt sand at Amboy's facility in South Amboy, New Jersey. *See* Trial Transcript (hereinafter "Tr.") at 90–91; Amboy Ex. B. Pursuant to a contract with Amboy, GLI agreed to tow and deliver Amboy's scows from Amboy's facility to its customers in the tri-state area. *See* Towage Agreement between GLI and Amboy, signed Sept. 13, 1990, Amboy Trial Ex. C. On October 10, 1994, Amboy placed Scow MC–191 in the care, custody, and control of GLI for towage to a customer in Norwalk, Connecticut. *See* Letter from Thomas A. Newton, Chief Financial Officer of Amboy, to Joseph J. Perrone, Esq., dated July 14, 1997, Amboy Ex. B. On October 12, 1994, Scow MC–191 was affixed to a floating mooring buoy in the Long Island Sound off the coast of Port Chester, New York. *See* Deposition Transcript of Alec Marcinowski, dated Aug. 26, 1997 (hereinafter "Marcinowski II"), at 9.

On October 12, 1994, plaintiff was employed as a deckhand on the tug *McCormack Boys,* which was owned by McCormack and operated and staffed by plaintiff's employer, GLI. *See id.* at 6. As a deckhand, plaintiff was considered a "seaman" pursuant to the Jones Act.[1] Plaintiff was a highly experienced deckhand, having worked on tugboats since 1969. *See* Deposition Transcript of Alec Marcinowski, dated Nov. 13, 1996 (hereinafter "Marcinowski I"), at 10–11. On the evening of October 12, 1994, the tug *McCormack Boys* towed unloaded barges to the Port Chester mooring and exchanged them for loaded barges, including Scow MC–191. *See id.* at 14. Since it was dark, the tug was required to place two navigation lights on the loaded scows. *See id.* at 14. GLI's procedure for transferring the navigation lights between the unloaded and loaded scows required placing one deckhand on an unloaded scow and one deckhand on a loaded scow. *See id.* at 12–15. To transfer the lights, the deckhand on the unloaded scow would throw the navigation lights onto the sand in the cargo load of the loaded scow. *See id.* At that point, the deckhand on the loaded scow would climb into the sand load to pick out the navigation lights and place them in their proper position on the loaded scow. *See id.* Cross-claimants' procedure for transferring navigation lights between scows is the custom and practice in the tugboat industry. *See id.* at 37; Tr. 50.

After *McCormack Boys* arrived at the Port Chester mooring buoy, deckhand Todd Dady got off the tug and onto an unloaded barge. *See* Marcinowski II at 15. After transferring the mooring lines from the loaded scow to the light scow, Dady retrieved the navigation lights and threw them into the sand load of Scow MC–191. *See id.* at 29. In order to retrieve the navigation lights, plaintiff went to the side of Scow MC–191 and climbed

---

[1]. A "seaman" is "a maritime employee who has a substantial employment-related connection to a vessel *in navigation.*" *Chandris v.* *Latsis,* 515 U.S. 347, 373, 115 S.Ct. 2172, 132 L.Ed.2d 314 (1995) (emphasis in original).

over the rail of the cargo area into the sand load. *See id.* at 26–29. Before climbing the rail, plaintiff did not check to see whether he was in the vicinity of a freeing port. *See id.* at 68. The navigation lights were located on the sand a couple of feet from the rail, and plaintiff attempted to walk across the sand load to the lights. *See id.* at 29. Before plaintiff reached the lights, he stepped into a cavity in the sand—known as a washout—and severely injured his left knee. *See id.* at 29.

This was not the first time plaintiff had encountered washouts. He testified that every deckhand is well aware that washouts occur routinely on sand barges, and that he himself had fallen into at least ten washouts previously. *See id.* at 35–36 In fact, plaintiff had injured his right knee in a similar washout a year or so before this accident. *See id.* at 35. Washouts are created when water enters the sand-filled cargo area of the scow, and then is discharged through freeing ports, known as scuppers, at the base of the cargo area. *See* Marcinowski I at 17. As the water exits the cargo hold through the scuppers, some sand washes out of the cargo hold with the water. *See id.* This discharge creates a cavity below the surface level of the sand. *See id.* Because washouts occur below the surface of the sand, they cannot be detected by looking at the top of the sand load. *See* Marcinowski I at 53–54. It is undisputed that washouts occur only in the area surrounding the scuppers. *See* Marcinowski II at 66. Therefore, an experienced deckhand should look for the presence of scuppers, as well as discharged sand on the scow's walkway, be-

fore climbing into the cargo area of a scow to avoid falling into washouts. *See* Tr. 81–83.

Scuppers are necessary and required on all sand scows, including Scow MC–191. *See* Tr. 143. Without scuppers to permit the drainage of water from the cargo load, a scow would become unstable and flip over. *See* Tr. 143–44; Marcinowski I at 16. Therefore, scuppers are compromises by necessity. Large scuppers make the scow significantly more stable by readily relieving the cargo hold of excess water and some sand; on the other hand, small scuppers allow less water and sand out of the cargo hold, thereby making the scow more unstable. *See* Tr. 144–48. The scuppers on Scow MC–191 were four inches high and twelve inches wide, the typical size and design for sand scows. *See* Tr. 37, 144. Indeed, it is undisputed that Scow MC–191 itself is of typical design and dimensions. *See* Tr. 30, 142–43. However, the walkway surrounding the cargo area of Scow MC–191 was twenty eight and one-half (28.5) inches wide, which was wider than normal for sand scows. *See* Tr. 30. This wider walkway naturally made it safer for deckhands to circumambulate Scow MC–191 when compared to the typical, narrower walkways of other scows. *See* Tr. 66.

## CONCLUSIONS OF LAW

### I. *Ryan* Indemnity

The Second Circuit recently declared that "*Ryan* indemnity is virtually dead . . . in this Circuit." *Lubrano v. Waterman Steamship Co.*, 175 F.3d 274, 276 (2d Cir. 1999).[2] Nevertheless, cross-claimants at-

---

**2.** *Ryan* indemnity has also been abolished in the Court of Appeals for the Fifth, Eleventh, and Ninth Circuits, who instead use the principle of comparative fault to allocate liability for a seaman's injury. *See, e.g., Smith & Kelly*

*Co. v. S/S Concordia TADJ*, 718 F.2d 1022, 1028–29 (11th Cir.1983) (declining to apply *Ryan* indemnity to injuries by a seaman). However, the Third, Fourth, and Sixth Circuits continue to apply *Ryan* indemnity. *See,*

tempt to resurrect *Ryan* in this action. Specifically, cross-claimants contend that they are entitled to full *Ryan* indemnity from Amboy for their $84,410.50 settlement with plaintiff because Amboy allegedly breached an implied duty of workmanlike performance in loading Scow MC 191.[3] Moreover, cross-claimants contend the *Lubrano*'s holding—absent an express indemnification clause, a contract between a shipowner and stevedore does not contain an implied duty on behalf of the stevedore to indemnify the shipowner for liability to injured longshoreman—is strictly limited to an action by longshoremen,[4] and therefore inapplicable to this action because plaintiff was a seaman. *See* Cross-claimants' Trial Memorandum of Law at 15.

## A. Standards for *Ryan* Indemnity

The context in which *Ryan v. Stevedoring Co. v. Pan–Atlantic S.S. Corp.*, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956), was decided is crucial to understanding its holding and application to this action. In *Seas Shipping Co. v. Sieracki*, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), the Supreme Court found that a shipowner could be held strictly liable to longshoremen employed by an independent stevedoring contractor for injuries caused by dangerous conditions aboard the ship. *Id.* at 99–103, 66 S.Ct. 872. According to *Sieracki*, the vessel's dangerous conditions caused the ship to be unseaworthy; therefore, the shipowner was subject to strict liability, notwithstanding that the dangerous conditions aboard the ship were likely caused by the stevedoring contractor's own actions. *See id.* A few years later, in *Halcyon Lines v. Haenn Ship Ceiling & Refitting Corp.*, 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318 (1952), the Supreme Court held that the Longshore and Harbor Workers Compensation Act (hereinafter "LHWCA"), 33 U.S.C. § 901 *et seq.*, which limited an employer's liability with respect to its injured employees, precluded shipowners who had been held strictly liable to an injured longshoreman from obtaining contribution from the longshoreman's employing stevedore. *Id.* at 286–87, 72 S.Ct. 277. Thus, the shipowner was in an "unenviable position: A longshoreman might be injured as a result of an unseaworthy condition caused wholly by the stevedore's negligence, and yet the shipowner, wholly without fault, could be held liable for the entire amount of compensatory damages." *Fairmont Shipping Corp. v. Chevron Int'l Oil Co.*, 511 F.2d 1252, 1255 (2d Cir.1975). "The shipowner's plight was a situation which cried out for relief, and that relief was granted in *Ryan*." *Fairmont*, 511 F.2d at 1256.

In *Ryan*, the Supreme Court held that a shipowner could seek indemnity from the stevedore-employer for the shipowner's liability to an injured longshoreman-employee for unseaworthiness, based on the theory that the stevedore had breached an implied warranty of workmanlike performance to the shipowner. *See Ryan*, 350 U.S. at 130–31, 76 S.Ct. 232. Thus, those shipowners who were forced to pay a judgment to an injured longshoreman as a

---

*e.g., Cooper v. Loper*, 923 F.2d 1045, 1051 (3d Cir.1991).

**3.** Cross-claimants' settlement with plaintiff does not affect their right to indemnity. *See, e.g., Boykin v. China Steel Corp.*, 73 F.3d 539, 542 (4th Cir.1996); *Bertram v. Freeport McMoran, Inc.*, 35 F.3d 1008, 1017–18 (5th Cir.1994).

**4.** A longshoreman is a land-based maritime employee who performs a variety of tasks on vessels, including the loading and unloading of cargo. *See* 1 Thomas J. Schoenbaum, Admiralty & Maritime Law § 7–1 at 380 (3d ed.2001).

result of an unsafe condition created by a stevedore could fully recover from that stevedore under the theory of indemnification. *See id.; see also Zapico v. Bucyrus–Erie Co.*, 579 F.2d 714, 721 (2d Cir.1978) (Friendly, J.) (finding that *Sieracki* necessitated the decision in *Ryan* in order "that ultimate liability would not rest on the innocent (or relatively innocent) shipowner, as it would have if only *Sieracki* and *Halcyon* stood as law.").

In 1972, Congress amended the LHWCA, which made "substantial changes" to the framework surrounding *Ryan* indemnity. *See Gravatt v. City of New York*, 226 F.3d 108, 116 (2d Cir.2000). In addition to substantially increasing the statutory compensation benefits provided to longshoremen under the LHWCA, the amendments abolished both the injured longshoreman-employee's right to recover against a shipowner under the strict liability theory of unseaworthiness, and the shipowner's corresponding right to indemnity from the stevedore. *See Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156, 165, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981). Longshoremen, however, were still entitled to proceed against shipowners for negligence. *See Kakavas v. Flota Oceanica Brasileira*, 789 F.2d 112, 117 (2d Cir.1986) (Friendly, J.). In these amendments, "Congress clearly intended that the 'vessel's liability is to be based on *its own negligence.*' " *Gravatt*, 226 F.3d at 117 (quoting H.R.Rep. No. 92–1441, 1972 U.S.C.C.A.N. at 4704) (emphasis in original). Additionally, the amendments "intended 'to shift more of the responsibility for compensating injured longshoremen to the party best able to prevent injuries: the stevedore-employer.' " *Id.* at 118 (quoting *Howlett v. Birkdale Shipping Co.*, 512 U.S. 92, 97, 114 S.Ct. 2057, 129 L.Ed.2d 78 (1994)). Therefore, *Ryan* 's precise holding—that a shipowner held strictly liable under *Sieracki* may seek indemnification

from the employing stevedore—has been overruled. However, the 1972 amendments do not address whether *Ryan* indemnity survives against nonemploying stevedores, *see Lubrano*, 175 F.3d at 278, or when the injured employee is a seaman.

The Second Circuit has limited *Ryan* indemnity to cases where a shipowner was exposed to strict liability as a result of the breach of the implied warranty of workmanlike performance. *See Fairmont Shipping*, 511 F.2d at 1257; *Navieros Oceanikos, S.A. v. S.T. Mobil Trader*, 554 F.2d 43, 44–47 (2d Cir.1977) ("in the absence of plaintiff's exposure to strict liability regardless of fault this is not a *Ryan* case and ... there is no basis for an indemnity....."). Thus, *Ryan* indemnity is only available when the following elements are present:

> "a shipowner, relying on the expertise of another party (contractor), enters into a contract whereby the contractor agrees to perform services without supervision or control by the shipowner; the improper, unsafe or incompetent execution of such services would foreseeably render the vessel unseaworthy or bring into play a pre-existing unseaworthy condition; and the shipowner would thereby be exposed to liability regardless of fault."

*Fairmont Shipping*, 511 F.2d at 1258. Moreover, the Second Circuit has been reluctant to recognize an implied warranty of workmanlike performance in the absence of an "extensive relationship" between the parties. *Black v. Red Star Towing & Trans. Co.*, 860 F.2d 30, 32 (2d Cir.1988) (en banc) (refusing to imply a warranty of workmanlike performance between a tugboat and Mobil Oil Corporation, a third-party tortfeasor). Here, it unnecessary to determine whether *Ryan* indemnity is available to seamen in this

Circuit, because even if *Ryan* indemnity were available, cross-claimants could not recover under *Ryan* for the following reasons: (1) Amboy never contracted to perform services in a workmanlike manner; (2) Amboy never breached an implied warranty of workmanlike performance; and (3) cross-claimants' contributory negligence precludes indemnity. The Court will address in turn each factor precluding *Ryan* indemnity.

## B. Implied Warranty of Workmanlike Performance

Most significantly, the contract between GLI and Amboy contained no implied warranty of workmanlike performance on Amboy's behalf. Although every maritime services contract contains a warranty of workmanlike performance, the basis of that warranty is that a party "who contracts to provide services impliedly agrees to perform in a diligent and workmanlike manner." *Fairmont*, 511 F.2d at 1259–60 (quoting 9 S. Williston, Contracts 1012C, at 38–39 (3d ed. Jaegar 1967)). It is therefore axiomatic that "the warranty of workmanlike performance does not arise unless the putative warrantor is performing some type of service for the party asserting the warranty." *See Fontenot v. Mesa Petroleum Co.*, 791 F.2d 1207, 1212 (5th Cir.1986).

In the contract at issue here, GLI agreed to perform "all necessary towing of Amboy's scows from South Amboy, New Jersey to Amboy's customers." *See* Towage Agreement between GLI and Amboy, Amboy Trial Ex. C. Amboy, however, did not agree to perform *any* services as part of the contract. Cross-claimants attempt to overcome this obstacle by suggesting that Amboy should be treated as a stevedore for purposes of this action because it loaded the asphalt sand onto Scow MC–191 itself. The Court finds this argument decidedly unpersuasive. The fact that Amboy loaded Scow MC–191 has no bearing on the fact that it was GLI, rather than Amboy, that impliedly agreed to perform its towing services in a workmanlike manner. Additionally, characterizing Amboy as a stevedore would ignore the unique position of stevedores vis-a-vis shipowners, while disregarding the particular circumstances under which *Ryan* indemnity developed. Furthermore, this argument would require the Court to expand the implied warranty of workmanlike performance beyond all reasonable bounds. Therefore, cross-claimants' argument is untenable. Thus, without an implied warranty of workmanlike performance on Amboy's behalf, *Ryan* indemnity is clearly unavailable to cross-claimants in this action.

## C. Breach of the Implied Warranty of Workmanlike Performance

Even assuming *arguendo* that the contract at issue here did contain an implied warranty of workmanlike performance by Amboy, *Ryan* indemnity would nonetheless be unavailable to cross-claimants because Amboy never breached this warranty. At trial, cross-claimants failed to offer any evidence to demonstrate that Amboy loaded the asphalt sand into Scow MC–191 negligently. Instead, cross-claimants argued that because a washout occurred in the cargo area of Scow MC–191, Amboy must have loaded the barge improperly. This contention, however, is belied by the undisputed evidence at trial that washouts occur quite regularly on sand scows as a result of water entering the cargo area. *See* Marcinowski I at 16–18. Indeed, washouts are an inevitable byproduct of the scow's discharging water that has found its way into the cargo area, which is necessary to ensure that the scow does not become unstable and flip. *See* Tr. 143–144. In fact, Marcinowski concedes that

he himself has fallen into at least ten washouts while in the cargo area of sand scows. *See* Marcinowski II at 35–36. Therefore, based on the evidence submitted in this case, the presence of washouts does not indicate any negligence, or breach of an implied warranty of workmanlike performance, by Amboy.

Cross-claimants next argue that Amboy breached an implied warranty of workmanlike performance because Scow MC–191 was rendered unseaworthy as a result of (1) Amboy's failure to place a screen over the scuppers to prevent sand discharge and (2) "inadequate walkways" aboard the scow. Cross-claimants' Trial Memorandum at 18. The Court finds cross-claimants' arguments unpersuasive. First, although cross-claimant's expert witness, Eric Johansson, testified that placing a screen device or a restrictive plate over a scupper would reduce the discharge of sand from the scupper, and thereby reduce the likelihood of washouts, cross-claimants failed to establish that a scow that was not equipped with these devices was unseaworthy. Quite to the contrary, both sides proffered testimony that Scow MC–191 was quite typical in design to other sand scows. *See* Tr. 30, 142. In this regard, Amboy proffered undisputed testimony that the scuppers on MC–191 were typical in their design and size. *See* Tr. 144. Moreover, Amboy offered credible testimony that Scow MC–191 was safer *without* a screen device or restrictive plate covering its scuppers because the screen or plate would prohibit water from leaving the scow, making the scow more likely to flip. *See* Tr. 145 (noting that an argument could be made that the scuppers on Scow MC–191 should be *larger* to provide more stability). Finally, there was undisputed testimony adduced at trial that the walkway surrounding Scow MC–191 was 28.5 inches wide, which was wider than the typical walkway on sand scows. *See* Tr. 30, 66.

Since wider walkways are inherently safer for crew members to walk on, *see* Tr. 66, cross-claimants' argument is meritless. Therefore, in light of Scow MC–191's typical dimensions and scupper size, cross-claimants have failed to establish that Scow MC–191 is unseaworthy. Accordingly, Amboy could not have breached an implied warranty of workmanlike performance in this action.

**D. Contributory Negligence**

■ Finally, cross-claimants' contributory negligence in causing plaintiff's injury also precludes their claim for *Ryan* indemnity in this action. Although the Supreme Court has noted that a shipowner's contributory negligence is not necessarily fatal to its claim for indemnity, *see Italia Societa per Azioni di Navigazione v. Oregon Stevedoring Co.*, 376 U.S. 315, 320, 84 S.Ct. 748, 11 L.Ed.2d 732 (1964), it is well established that a certain level of contributory negligence will bar a shipowner's claim for indemnity. *See Weyerhaeuser Steamship Co. v. Nacirema Operating Co.*, 355 U.S. 563, 567, 78 S.Ct. 438, 2 L.Ed.2d 491 (1958) ("the [shipowner] was entitled to indemnity absent conduct on its part sufficient to preclude recovery"); *see also Hurdich v. Eastmount Shipping Corp.*, 503 F.2d 397, 401 (2d Cir.1974) ("The shipowner can by its own conduct foreclose its right to indemnity."); *Navieros*, 554 F.2d at 46–47 ("there is no basis for an indemnity that disregards the plaintiff's contributory negligence"). While the Supreme Court has not defined the level of contributory negligence necessary to bar a shipowner's claim for indemnity, the Second Circuit has developed tests to determine whether indemnity is available in light of a shipowner's negligence. *See, e.g., Rodriguez v. Olaf Pedersen's Rederi A/S*, 527 F.2d 1282, 1282 (2d Cir.1975); *Hurdich*, 503 F.2d at 401. In situations where a

shipowner had knowledge of a potentially dangerous condition and had control over the area in which the injury occurred, as in the instant case, the Second Circuit emphasizes that "liability should fall upon the party best situated to adopt preventive measures and thereby to reduce the likelihood of injury." *Hurdich,* 503 F.2d at 401 (quoting *Italia Societa,* 376 U.S. at 324, 84 S.Ct. 748). Therefore, the Second Circuit precluded indemnity in *Hurdich* where the shipowner and the stevedore were concurrently negligent, and the shipowner knew of a dangerous condition that existed on the ship and failed to take "corrective measures necessary to reduce or eliminate the risk of injury." *Id.* at 402; *see also Cruz v. Sea–Land Serv. Inc.,* No. 96 Civ. 6153, 1998 WL 299864, at *6–7 (S.D.N.Y.1998) (Mukasey, J.) (shipowner who was generally aware of dangerous condition on the ship and maintained exclusive control over the ship for one and a half days was precluded from indemnity on account of its failure to take measures to prevent a seaman's injury).

Here, Amboy argues that liability should fall on cross-claimants because they were in the best position to guard against the hazards of washouts and to avoid plaintiff's injuries. *See* Amboy's Trial Memorandum of Law at 6–8. Amboy also argues that cross-claimants' procedure for transferring navigation lights from an unloaded scow to a loaded scow was inherently dangerous and negligent, and contributed significantly to plaintiff's injuries. *See id.* Cross-claimants contend, on the other hand, that their practice of exchanging navigation lights from scow to scow was not negligent, and was in fact the custom and practice in the tugboat industry. *See* Tr. 50. Cross-claimants' reliance on the custom and practice of the tugboat industry, however, is unavailing. Indeed, it is well established that "conformity to custom is not in itself the exercise of due care." *Tug*

*Ocean Prince, Inc. v. United States,* 584 F.2d 1151, 1156 (2d Cir.1978) (finding that the customary practice of the tugboat industry was not the proper standard of care in the case), *cert. denied,* 440 U.S. 959, 99 S.Ct. 1499, 59 L.Ed.2d 772 (1979). "[I]f a given industry lags behind in adopting procedures that reasonable prudence would dictate be instituted, then [courts] are free to hold a given defendant to a higher standard of care than that adopted by the industry." *Hoemke v. New York Blood Center,* 912 F.2d 550, 552 (2d Cir.1990). For, as the Second Circuit has observed, "there are precautions so imperative that even their universal disregard will not excuse their omission." *The T.J. Hooper,* 60 F.2d 737, 740 (2d Cir.) (L.Hand, J.), *cert. denied,* 287 U.S. 662, 53 S.Ct. 220, 77 L.Ed. 571 (1932).

At trial, cross-claimants did not contest that having a deckhand climb into the cargo area of a scow and walk on top of the sand is dangerous. Instead, they proffered testimony that this procedure is safer than having deckhands walk along the outer walkway of the scow. *See* Tr. 47–50. However, cross-claimants overlook the fact that there were safer alternatives available to transfer the navigation lights between scows. Indeed, cross-claimants' own expert witness—Eric Johansson—conceded that it is possible, albeit difficult, for a deckhand on the unloaded scow to hand down the navigation lights to a deckhand on the full scow. *See* Tr. 50. Johansson also conceded that a deckhand on the unloaded scow could simply toss the navigation lights to a deckhand on the full scow, a practice cross-claimants "certainly" utilize "during the daylight hours." Tr. 73. In addition to those two potential alternatives, Amboy offered credible testimony that deckhands could tie a line onto the navigation lights and lower them from scow to scow on this line. *See* Tr. 151.

Furthermore, Amboy offered persuasive testimony that it is not difficult for a deckhand to carry the two navigation lights, each weighing only three pounds, *see* Marcinowski II at 12, in one hand while safely walking along the walkway of Scow MC–191. *See* Tr. 186. Indeed, the very purpose of Scow MC–191's walkway was to provide deckhands a safe area in which to move around the scow. Finally, the Court finds the Report of C.R. Cushing & Company persuasive. *See* Amboy Ex. E. This report concluded that cross-claimants' practice of transferring navigation lights between scows does not demonstrate reasonable care and is highly dangerous.[5] Therefore, the Court finds that cross-claimants' procedure for transferring navigation lights between scows is inherently dangerous and unsafe. Any of the aforementioned alternatives is safer than having a deckhand climb up a four-foot high rail and hike through the sand where undetectable washouts routinely occur. The Court also finds that cross-claimants were best situated to adopt preventive measures to reduce the likelihood of potential injury, and therefore that cross-claimants' contributory negligence in causing plaintiff's injury precludes any recovery under *Ryan*.

Accordingly, for all the foregoing reasons, cross-claimants' claim for *Ryan* indemnity is denied.

## II. Maintenance and Cure

 Maintenance and cure is the implied contractual right of a seaman who is injured while in the service of the ship, regardless of fault, to payments from the shipowner through the time of maximum recovery. *See Red Star Towing*, 860 F.2d at 30. The doctrine of maintenance and cure developed to give seamen no-fault damage recovery in recognition of the dangerous character of their work and their precarious position while at sea. *See id.* The seaman's right to maintenance and cure is independent of any other source of recovery by the seaman. *See id.* A shipowner may recover complete indemnification or contribution from a third party whose negligence partially or wholly caused the seaman's injury. *See id.*

 In the Second Circuit, a shipowner's right to recover maintenance and cure payments made to an injured seaman is governed by the principle of proportionate fault. *See id.* at 34. That is, a third-party tortfeasor is liable to the shipowner for contribution equal to its proportionate share of fault for the seaman's injury. *See id.* The shipowner's recovery for maintenance and cure payments is not barred by the shipowner's settlement with an injured seaman. *See Bertram v. Freeport McMoran, Inc.*, 35 F.3d 1008 (5th Cir.1994).

Here, cross-claimants assert that Amboy is fully responsible for Marcinowski's injury, and thus seek complete indemnification for the $30,213.72 in maintenance and cure they paid to him. Alternatively, cross-claimants argue that Amboy is liable in

---

**5.** The C.R. Cushing & Company Report concludes that:

"The transfer of the portable side lights from one scow to another should be accomplished in a more sensible way. As demonstrated by [plaintiff's] incident, what was reported to be the accepted practice of throwing or placing the sidelights on top of the cargo was and is hazardous to seamen that follow such a practice. As noted in the discussion paragraphs of this report, the need for a person to gain access to the top of the cargo requires following a relatively hazardous path from the narrow and sand covered margin plate to the top of the longitudinal coaming and then up the sloping sides of a relatively unstable cargo. This path can and does result in accidents of a similar nature and it can result in other serious accidents ranging from a fall overboard to a fall from the coaming onto the margin plate." Amboy Ex. E at 3.

contribution for plaintiff's maintenance and cure payments to the extent of its proportionate share of fault for plaintiff's injuries, as determined by the Court. Amboy counters that it bears no responsibility for plaintiff's injury, and therefore should not be held liable for indemnification or any contribution towards cross-claimants' maintenance and cure payments to plaintiff. Therefore, the Court must determine each party's proportionate share of fault for plaintiff's injury, and allocate the indemnity/contribution, if any, accordingly.

 The Court finds that plaintiff's failure to check the outside rail of Scow MC–191 for the presence of scuppers before climbing into the cargo hold of the scow caused his injury. Had plaintiff checked the rail to find a location away from a scupper, he likely would not have fallen into a washout and injured his knee. As an experienced deckhand, plaintiff was well aware of the presence of washouts and their location near scuppers. Therefore, plaintiff bears fifty percent (50%) of the fault for his injury.

As discussed in greater detail above, the Court finds that cross-claimants' procedure for transferring navigation lights between scows exposed its deckhands, including plaintiff, to a substantially high degree of risk for injury. In light of the substantial risk involved in climbing into the cargo hold and treading through the sand replete with washouts, and the far safer alternatives available, cross-claimants' procedure was unreasonably dangerous and contributed significantly to plaintiff's injury. Therefore, the Court finds that cross-claimants bear fifty percent (50%) of the fault for plaintiff's injury.

Finally, the Court finds that Amboy was not negligent in its loading, operation, or maintenance of Scow MC–191, nor did it contribute in any way to plaintiff's injury.

Therefore, the Court finds that Amboy bears no fault for plaintiff's injury.

Accordingly, cross-claimants' claim for contribution from Amboy for the maintenance and cure payments made to plaintiff is denied.

## CONCLUSION

For the foregoing reasons, GLI and McCormack's claim for *Ryan* indemnity is HEREBY DENIED. Likewise, GLI and McCormack's claim for contribution for maintenance and cure payments made to plaintiff is likewise DENIED. The Clerk of the Court is directed to enter judgment in accordance herewith.

**SO ORDERED.**